# Exhibit "A"

Attached to:
<u>Defendant Sosa's Opposition to;</u>

<u>Petitioner's Motion in Limine Re: Police Reports [Doc. #141]</u>

RECEIVED

FEB  4 2022

LATTI & ANDERSON LLP

## UNITED STATES DISTRICT COURT
### for the
## DISTRICT OF MASSACHUSETTS

Civil Action No. 1:19-cv-10719-PBS

In Re:                                        )
**CAPTAIN JUAN INC., as owners of the**       )
**F/V CAPTAIN BILLY HAVER,**                  )
      **Petitioner.**                        )

### PETITIONER'S EXPERT DISCLOSURE

NOW COME the Petitioner in the above-captioned action, Captain Juan, Inc. ("Petitioner"), in accordance with Fed. R. Civ. P. 26(a)(2), and hereby disclose the witnesses it may use at trial to present evidence under Rules 702, 703, or 705 of the Federal Rule of Evidence. Each witness disclosed herein is expected to provide testimony based upon his or her knowledge, skill, experience, training, and education as well as the evidence of record in this case.

To the extent any witness offered by Claimant expresses an opinion at trial or subsequently in discovery that has not been divulged prior to the time that this disclosure was served on counsel, and which creates a need for additional areas of rebuttal testimony or evidence, Petitioner expressly reserves the right to supplement these expert disclosures and to call such additional expert witnesses as may be necessary to rebut any previously undisclosed testimony or opinions.

Petitioner may call, live or by deposition, or other transcript, any of the witnesses listed below, as well as any of the witnesses listed by Claimant. By listing or referring to any witness herein, Petitioner does not thereby admit competency, admissibility, validity, or content, and Petitioner reserves all objections. The following disclosures are summaries of the subject matters and opinions about which some of these witnesses are expected to testify, which Petitioner can identify at this time. By identifying possible areas of testimony, Petitioner is not

1

intending to limit any expert solely to whatever is listed and will update any disclosure statements as additional areas of potential testimony become known to Petitioner.

Petitioner may, but shall not be required to by inclusion herein, call the following expert witnesses at trial:

1.      Dana P. Collyer, NAMS-CMS
        Marine Safety Consultants, Inc.,
        26 Water Street
        <u>Fairhaven, MA 02791</u>

Based on his knowledge, skill, experience, training, and education, as well as his review of listings of comparable vessels[1] and his inspection of the F/V CAPTAIN BILLY HAVER on or about May 3, 2019, Mr. Collyer is expected opine that the fair market value of the F/V CAPTAIN BILLY HAVER was $1,100,000.00 at the conclusion of the voyage from September 18, 2018, to September 26, 2018.  Mr. Collyer will testify consistently with his prior appraisal attached hereto as, <u>Exhibit 2</u>.  Mr. Collyer is expected to describe the condition of the Vessel to the Court.  Mr. Collyer may discuss the permits issued to the vessel and explain the regulatory scheme of those permits.

Finally, Mr. Collyer is expected to respond to and to rebut, clarify, or contextualize the deposition and/or trial testimony of any witness, including but not limited to any expert witness, offered by Claimant.

Mr. Collyer will be compensated at the rate of $200.00 per hour for his study and testimony in the case.  Mr. Collyer's curriculum vitae is attached hereto as <u>Exhibit 3</u>.

1.      Peter K. Ashton
        Premier Quantitative Consulting, Inc.
        P.O. Box 1475
        <u>Concord, MA 01742</u>

---

[1] See <u>Exhibit 1</u>.

Based upon his knowledge, skill, experience, training, and education, as well as his review of the pertinent evidence in this matter including Plaintiff's interrogatory answers, financial records and tax returns, deposition and trial testimony and any other evidence introduced at trial, Peter K. Ashton will provide opinions and testimony consistent with his report which is attached hereto as Exhibit 4.  The curriculum vitae of Mr. Ashton is attached to his report.  See Exhibit 4.  Mr. Ashton charges $375.00 per hour.  For further information, including Mr. Ashton's publications during the past ten years and testimony over the past four years, please see Exhibit 4.

### **NON-RETAINED WITNESSES**

1.      Juan Araiza,
        1636 Janke Road
        Virginia Beach, VA  23455

Mr. Araiza is the owner of the F/V CAPTAIN BILLY HAVER.  As owner, Mr. Araiza is familiar with, and expected to testify to, the value of his interest in the Vessel and its freight pending at the conclusion of the voyage on or about September 26, 2018.  Mr. Araiza may discuss and authenticate prior surveys of the F/V CAPTAIN BILLY HAVER.  Mr. Araiza will testify to the insured value of the F/V CAPTAIN BILLY HAVER and discuss the annual process of apply for coverage renewals.  Mr. Araiza may provide testimony regarding the price at which he would have sold the F/V CAPTAIN BILLY HAVER.  Likewise, Mr. Araiza may testify to the price he, or a similarly situated willing buyer would reasonably have paid for the F/V CAPTAIN BILLY HAVER at the conclusion of the voyage in September of 2018.

In addition to the value of the F/V CAPTAIN BILLY HAVER, Mr. Araiza may discuss Petitioner's corporate structure.  He may also discuss its business contacts and operations in the Virginia commercial fishing community.  Such testimony may include, but is not limited to,

routine practices for hiring and manning vessels. Mr. Araiza may explain the laws and regulations pertaining to hiring crewmembers. Mr. Aaiza may also explain the customs and practices of the commercial fishing industry pertaining to the hiring of crewmembers. Mr. Araiza may express his knowledge of the facts surrounding the grounding of the F/V CAROLINA QUEEN III. Based upon this knowledge, Mr. Araiza may opine that it was unlikely Mr. Sosa would ever have received another position as captain.

Defendants reserve the right to amend these expert witness disclosures in accordance with any applicable procedural rules and/or orders of the Court as justice so requires.

Respectfully Submitted:

For the Petitioner,
**Captain Juan Inc., as owners of
the F/V CAPTAIN BILLY HAVER,**
By its attorneys,

**Regan & Kiely, LLP,**

/s/ Francis G. McSweeney
Joseph A. Regan, Esquire (BBO #543504)
Francis G. McSweeney, Esq. (BBO #682922)
40 Willard Street, Suite 304
Quincy, MA  02169
(617)723-0901
(617)723-0977 *facsimile*
jar@regankiely.com
fgm@regankiely.com

Dated: February 4, 2022

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that the foregoing document filed through the ECF system, will be sent electronically to all registered participants as identified on the Notice of Electric Filing (NEF), and paper copies will be sent to those indicated as non-registered participants, on February 4, 2022.

/s/ Francis G. McSweeney
Francis G. McSweeney

# EXHIBIT 1



**A TRINAV GROUP COMPANY**
# ATHEARN MARINE AGENCY, INC.
### Serving Fishermen Since 1946

10 Union Wharf, Fairhaven, MA 02719
Tel: (508) 999-4505   Email: sales@athearnmarine.com

| | |
|---|---|
| Select Language ▼ | |



| | |
|---|---|
| **FILE NO.** | **SH4790** |
| **VESSEL TYPE:** | 70' Steel Shrimper/Scalloper |
| **HULL TYPE:** | Steel |
| **LENGTH (LOA):** | 70ft. |
| **REG. LENGTH:** | 68ft. |
| **BREADTH:** | 23ft. |
| **DEPTH:** | 11ft. |
| **DRAFT:** | 8ft. |
| **YEAR BUILT:** | 2001 |
| **BUILT BY:** | Rorchies Shipyard |
| **RIGGING:** | Scalloper,Shrimp Dragger |
| **GROSS TONS:** | 83 |
| **CRUISE SPEED:** | 9 |

| | |
|---|---|
| **CAPACITIES** | HOLD CAPACITY: 60,000 lbs HOLD VOLUME: 60,000 FUEL: 12,000 gallons of Diesel FRESHWATER: 7,500 gallons |

| | | |
|---|---|---|
| **PROPULSION** | MAIN ENGINE 450HP, 8 Cylinder CAT 3408 Diesel and rebuilt in 2012 Comments: Complete engine overhaul | TRANSMISSION: Twin Disc GEAR RATIO: 6:1 SHAFT SIZE: 4" PROPELLOR: 61" x 62" STEERING TYPE: Electric/Hydraulic |

| | |
|---|---|
| **AUXILIARY ENGINES** | Isuzu - 23 KW Genset Isuzu - 23 KW Genset |

| | |
|---|---|
| **SAFETY EQUIPMENT** | (6) Life Rafts (6) Life Jackets (3) Life Rings (7) Fire Extinguishers EPIRB |

| ACCOMMODATIONS | (2) Cabins<br>(4) Berths<br>Electric Stove<br>Washroom<br>Shower<br>Heat/AC<br>Microwave<br>Freezer<br>Bathroom |
|---|---|
| ELECTRONICS | (2) Koden Radars<br>(2) Koden Sounders<br>(2) Garmin 162 and 1040xs Plotters<br>(4) VHF Radios<br>Simrad AP28 Autopilot<br>AIS Koden Class E<br>Alibi Camera System with 12 Cameras<br>(3) Computers<br>(2) PC Windplot<br>(1) Coastal Explorer<br>(2) SAT TV's<br>Davis Vantage Vu Weather System<br>Battery Backup with (3) 110/12 Volt Inverters<br>(2) 20 Amp Charles Battery Charger |
| DECK EQUIPMENT | McRoy 503 Trawl Winches - Wire Capacity: 1,200 9/16<br>Steel A-Frame<br>Steel Mast<br>Steel Boom<br>Steel 56' Stabilizers<br>Stainless Steel Trinet Winch |
| COMMENTS | Clutch in gear changed in 2017.  (3) stainless steel trawl winches, (1) stainless steel anchor winch.  Boat was completely rewired in 2014.  All hydraulics were installed new in 2014.  Boat was recently hauled out and painted with new zincs installed in July 2018.  Insulated fish hold also could be a freezer hold.  Hold is very well insulated.  Boat also has rolling chalks on the hull.<br><br>Vessel could be purchased without shrimping gear.  Inquire for price without gear.<br><br>Boat is in very good condition and very clean. |
| PRICE | $683,000 |

*THE INFORMATION GIVEN IS BELIEVED TO BE CORRECT BUT CANNOT BE GUARANTEED*

Copyright © Athearn Marine Agency, Inc. 2016. All Rights Reserved.
**Athearn Marine Agency** - Commercial Fishing Boat Brokers, Marine Brokers, Vessel Brokers, Used Boat Brokers
**Athearn Marine Agency** - Brokers of Commercial State & Federal Fishing Permits and DAS Leases
**Athearn Marine Agency** - Office Location: New Bedford MA.
Providing marine brokerage services to the New England States and East Coast USA since 1946. Primary area of business include these states: Maine, New Hampshire, Massachusetts, Rhode Island, Connecticut, New York, New Jersey, Delaware, Maryland, Virginia, North Carolina, South Carolina, Georgia, Florida.



**A TRINAV GROUP COMPANY**
# ATHEARN MARINE AGENCY, INC.
### Serving Fishermen Since 1946

10 Union Wharf, Fairhaven, MA 02719
Tel: (508) 999-4505   Email: sales@athearnmarine.com

Select Language ▼



| | |
|---|---|
| **FILE NO.** | **SH4778** |
| **VESSEL TYPE:** | 82' New Construction Steel Shrimper/Scalloper |
| **HULL TYPE:** | Steel |
| **LENGTH (LOA):** | 82ft. |
| **REG. LENGTH:** | 78ft. |
| **BREADTH:** | 26ft. |
| **DEPTH:** | 9ft. |
| **DRAFT:** | 6ft. 5in. |
| **YEAR BUILT:** | 2017 |
| **BUILT BY:** | Gulfbound LLC & Portier Fabrication |
| **RIGGING:** | Other,Scalloper,Shrimp Dragger |
| **GROSS TONS:** | 122 |
| **NET TONS:** | 97 |
| **CRUISE SPEED:** | 10 |

| **CAPACITIES** | HOLD CAPACITY: 100,000 lbs FUEL: 13,500 gallons of Diesel FRESHWATER: 5,000 gallons |
|---|---|

| **PROPULSION** | MAIN ENGINE (2) Mitsubishi S6A-3-Y3MPTAW Diesel, Built in 2018 | TRANSMISSION: (2) Twin Disc 514 GEAR RATIO: 4:1 SHAFT SIZE: 3.5" PROPELLOR: (2) 54" x 36" STEERING TYPE: Electric/Hydraulic |
|---|---|---|

| **AUXILIARY ENGINES** | (2) John Deere - 60 KW |
|---|---|

| | (4) Fire Extinguishers |
|---|---|

| **SAFETY EQUIPMENT** | |
|---|---|

| **ACCOMMODATIONS** | (2) Cabins<br>(6) Berths<br>Electric Stove<br>Washroom<br>Shower<br>Furnace<br>Microwave<br>Freezer<br>Refrigerator |
|---|---|

| **ELECTRONICS** | No Electronics |
|---|---|

| **DECK EQUIPMENT** | (2) McElroy 505 Stabilizer Winches |
|---|---|

| **COMMENTS** | This is a brand new vessel launched July of 2017.<br><br>2 x Mitsubishi S6A-3-Y3MPTAW main engines 540 HP each that only have 3 hours on the engines.<br><br>There are no electronics installed or included and the boat is not rigged.<br><br>The fish hold is not finished.<br><br>Thickness:  5/16" bottom and sides 1/4". |
|---|---|

| **PRICE** | $800,000 |
|---|---|

*THE INFORMATION GIVEN IS BELIEVED TO BE CORRECT BUT CANNOT BE GUARANTEED*

Copyright © Athearn Marine Agency, Inc. 2016. All Rights Reserved.
**Athearn Marine Agency -** Commercial Fishing Boat Brokers, Marine Brokers, Vessel Brokers, Used Boat Brokers
**Athearn Marine Agency -** Brokers of Commercial State & Federal Fishing Permits and DAS Leases
**Athearn Marine Agency - Office Location**: New Bedford MA.
Providing marine brokerage services to the New England States and East Coast USA since 1946. Primary area of business include these states: Maine, New Hampshire, Massachusetts, Rhode Island, Connecticut, New York, New Jersey, Delaware, Maryland, Virginia, North Carolina, South Carolina, Georgia, Florida.



A TRINAV GROUP COMPANY

**ATHEARN MARINE AGENCY, INC.**

*Serving Fishermen Since 1946*

10 Union Wharf, Fairhaven, MA 02719
Tel: (508) 999-4505   Email: sales@athearnmarine.com

| | |
|---|---|
| Select Language ▼ | |
| **FILE NO.** | **SH4979** |
| **VESSEL TYPE:** | 87.7 Steel Shrimper/Longliner/Sca |
| **HULL TYPE:** | Steel |
| **LENGTH (LOA):** | 94ft. |
| **REG. LENGTH:** | 87ft. 7in. |
| **BREADTH:** | 25ft. |
| **DEPTH:** | 12ft. 5in. |
| **YEAR BUILT:** | 2001 |
| **BUILT BY:** | B & B Boatbuilders |
| **RIGGING:** | Longliner,Scalloper,Shr Dragger |
| **GROSS TONS:** | 170 |
| **NET TONS:** | 51 |
| **CRUISE SPEED:** | 9 |



| | |
|---|---|
| **CAPACITIES** | FUEL: 35,000 gallons of Diesel FRESHWATER: 6,000 gallons |

| | | |
|---|---|---|
| **PROPULSION** | MAIN ENGINE 720HP, 12 Cylinder CAT 3412 Diesel, Built in 2001 | TRANSMISSION: Twin Disc GEAR RATIO: 7:1 |

| | |
|---|---|
| **AUXILIARY ENGINES** | (2) Isuzu, 130HP - 40 KW |

| | |
|---|---|
| **ACCOMMODATIONS** | (9) Berths (3) Cabins Electric Stove Microwave Freezer |

| | |
|---|---|
| **ELECTRONICS** | RADAR: Yes SOUNDER: Yes |

| | VHF: Yes<br>GPS: Yes |
|---|---|

| **COMMENTS** | This vessel has big power and a big reduction at 720 HP with 7:1 gear. She pulls hard, great 2 dredge scallop boat. |
|---|---|

| **PRICE** | $650,000 |
|---|---|

*THE INFORMATION GIVEN IS BELIEVED TO BE CORRECT BUT CANNOT BE GUARANTEED*

Copyright © Athearn Marine Agency, Inc. 2016. All Rights Reserved.
**Athearn Marine Agency -** Commercial Fishing Boat Brokers, Marine Brokers, Vessel Brokers, Used Boat Brokers
**Athearn Marine Agency -** Brokers of Commercial State & Federal Fishing Permits and DAS Leases
**Athearn Marine Agency - Office Location:** New Bedford MA.
Providing marine brokerage services to the New England States and East Coast USA since 1946. Primary area of business include these states: Maine, New Hampshire, Massachusetts, Rhode Island, Connecticut, New York, New Jersey, Delaware, Maryland, Virginia, North Carolina, South Carolina, Georgia, Florida.

A TRINAV GROUP COMPANY

## ATHEARN MARINE AGENCY, INC.
### Serving Fishermen Since 1946

10 Union Wharf, Fairhaven, MA 02719
Tel: (508) 999-4505   Email: sales@athearnmarine.com

| | |
|---|---|
| Select Language ▼ | |



| | |
|---|---|
| **FILE NO.** | **SC4935** |
| **VESSEL TYPE:** | 65' Steel Scalloper/Trawler |
| **HULL TYPE:** | Steel |
| **LENGTH (LOA):** | 65ft. |
| **REG. LENGTH:** | 65ft. |
| **BREADTH:** | 20ft. |
| **DEPTH:** | 10ft. |
| **DRAFT:** | 7ft. |
| **YEAR BUILT:** | 1969 |
| **BUILT BY:** | Rockport Yacht & Supply Company, Inc. |
| **RIGGING:** | Dragger,Scalloper |
| **GROSS TONS:** | 81 |
| **NET TONS:** | 41 |

| | |
|---|---|
| **FEDERAL PERMITS** | Black Sea Bass Commercial Moratorium<br>Summer Flounder Commercial Moratorium<br>Scallop - LAGC IFQ (Zero Allocation)<br>American Lobster Non Trap<br>American Lobster Area 5 Trap Waiver<br>NE Multi Species Individual DAS (Common Pool) 9.5673 A DAS<br>Scup Commercial Moratorium<br>Longfin Squid Butterfish Commercial Moratorium (Tier 1)<br>Monkfish D |

| | |
|---|---|
| **STATE PERMITS** | New Jersey Summer Flounder and New Jersey Black Sea Bass |

| | |
|---|---|
| **CAPACITIES** | FUEL: 8,000 gallons of Diesel FRESHWATER: 2,500 gallons |

| | | |
|---|---|---|
| **PROPULSION** | MAIN ENGINE<br>450HP, 8 Cylinder CAT 3408<br>Turbo Diesel Diesel | TRANSMISSION: Twin Disc 514-C<br>GEAR RATIO: 6:1 |

| | SHAFT SIZE: 4" S.S. |
| | STEERING TYPE: Hydraulic |

| **AUXILIARY ENGINES** | Kubota - 21 KW |

| **SAFETY EQUIPMENT** | All USCG Required Safety Equipment |

| **ACCOMMODATIONS** | (4) Total Berths<br>Fully equipped and outfitted galley and dinette to accommodate 3-4 crew<br>No head or shower facilities |

| **ELECTRONICS** | Furuno 36 Mile Radar<br>(2) Furuno FCV292 Fish Finders<br>(2) Furuno GPS Navigators<br>Shipmate RS2500 Plotter<br>(2) Icom VHF<br>(1) Other VHF<br>Standard LH10 Loudhailer<br>icom 700 SSB Radio<br>Simrad AP-35 Autopilot<br>Skymate Tracking VMS<br>SAT Phone<br>(2) Computers with Plotting Software and AIS |

| **DECK EQUIPMENT** | Pullmaster H-18 Trawl Winches<br>(2) Pullmaster PL-5 Stabilizer Winches<br>(4) H-5 Bag Winches<br>Single Stern Mounted Center Stern Ramp Net Reel<br>Constavolt<br>Also included in the purchase:<br>(2) 10.5 ft scallop dredges<br>Set of Trawl Doors<br>(2) Highriser Nets<br>(2) Whiting Nets<br>(2) Fluke Nets<br>(1) Squid Net |

| **COMMENTS** | 2015: Vessel was hauled and the hull was blasted and recoated, the lazarette was also blasted and recoated. the propeller was reconditioned and a new stainless steel stuffing box was installed.<br><br>2016: Old haulback winches were removed and new Pullmaster H-18 winches were installed. A winch control booth was added centerline on the forward end of the work deck.<br><br>2018: Vessel was hauled for routine maintenance. New rudder, water tank blasted.<br><br>Hull: Shellplate are reportedly 5/16" across hull bottom and hullside. Bulkheads are reportedly 1/4" plate. |

Work deck is reinforced with 3/4" armor plate through the port and starboard dredge landing areas.

Per Owner:  The current name of the vessel cannot be retained and used by Buyer.

| | |
|---|---|
| **PRICE** | $800,000 |

*THE INFORMATION GIVEN IS BELIEVED TO BE CORRECT BUT CANNOT BE GUARANTEED*

Copyright © Athearn Marine Agency, Inc. 2016. All Rights Reserved.
**Athearn Marine Agency -** Commercial Fishing Boat Brokers, Marine Brokers, Vessel Brokers, Used Boat Brokers
**Athearn Marine Agency -** Brokers of Commercial State & Federal Fishing Permits and DAS Leases
**Athearn Marine Agency - Office Location**: New Bedford MA.
Providing marine brokerage services to the New England States and East Coast USA since 1946. Primary area of business include these states: Maine, New Hampshire, Massachusetts, Rhode Island, Connecticut, New York, New Jersey, Delaware, Maryland, Virginia, North Carolina, South Carolina, Georgia, Florida.

# EXHIBIT 2

## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MASSACHUSETTS

In the Matter of the Complaint and
Petition by CAPT JUAN, INC, as owner
of the F/V CAPT BILLY HAVER, For
Exoneration from or Limitation of
Liability

**CIVIL ACTION
NO.: 19-cv-10719**

**IN ADMIRALTY**

*APPRAISER'S REPORT*

I, Dana P. Collyer, being the individual identified in the foregoing Motion for
Appointment of Appraiser by Petitioner, Captain Juan, Inc., which was granted on May 9,
2019, having attended to the duties assigned to me, and after a strict examination and
careful inquiry, I do estimate the appraise the said

**F/V CAPT. BILLY HAVER (O.N. 1038916)**

Fair Market Value of <u>$1,100,000.00</u>, inclusive of all anchors, tackle and apparel

And the value of her **PENDING FREIGHT:**

$65,968.75

In witness whereof I hereunto set my hand at Fairhaven, MA, this 6th day of May, 2019

Dana P. Collyer, NAMS CMS
Marine Safety Consultants, Inc.
26 Water Street
Fairhaven, MA 0279

# EXHIBIT 3

# DANA P. COLLYER
34 William Street
Fairhaven, MA 02719
(774) 451-2037

**EXPERIENCE**:

2004 to Present          **Marine Safety Consultants, Inc.**

**Marine Surveyor/Consultants**
A senior marine surveyor who specializes in commercial fishing vessels, tugs and barges, and hull and machinery.

Since joining Marine Safety Consultants, Inc in 2004 I have conducted surveys on all types of vessels (pleasure and commercial), barge and tug surveys, On and Off Charter surveys, load and stow inspections and off shore trip and tow surveys along the East and Gulf Coasts and the Caribbean, and marine liability and valuation surveys.  I am the lead CAT team senior surveyor who worked Hurricanes Francis, Jeanne, Wilma, Katrina, and Sandy.  Lead trainer since 2005 with the New Bedford Fishermen Safety Training Program.

I am Certified Marine Surveyor by the National Association of Marine Surveyors (NAMS-CMS) and has received accreditation from the American Boat & Yacht Council, participate in the safety training of commercial fishermen and is a USCG and AMSEA certified fishing vessel drill conductor and instructor, Ultrasonic Thickness Gauged certified, and 40-hour Hazwoper certified

Salient career highlights include:

2019 National Association of Maritime Surveyors, Certified Marine Surveyor (NAMS-CMS) Certified in Fishing Vessels

2016-2017 Survey and appraise major US inland and blue water barge and tug fleet for lenders, comprising over 60 units.

2013-2014:     Lead surveyor for a tandem ocean going load and stow and trip and tow, and return of construction equipment from New York to the Caribbean

2013-2014- Survey and appraise major US inland and blue water barge and tug fleet for lenders, comprising over 143 units.

2012- Present:  Special consultant and surveyor for major insurance underwriters on risk and liability assessment of marinas and marina operations in the Northeast and Mid-Atlantic regions.

2012:  Lead surveyor of a CAT team for Hurricane Sandy.  Oversaw over 400 damage surveys and salvages in New Jersey and New York.

2012:  Lead surveyor of the make ready and trip and tow for a dead ship tow of the USS EDISON from Philadelphia, PA to Bay City, MI

2011:  Project surveyor for comprehensive evaluation of twenty-four dinner/passenger vessels in eight US ports for a buyer.

2010-2011- Survey and appraise major US inland and blue water barge and tug fleet for lenders, comprising over 75 units.

2010:  Served as Operations Section Chief for MC-252 deep Water BP Response efforts, Pointe aux Chenes, LA.

2009 to 2015: Lead surveyor and Consultant- GE Hudson River Cleanup.  Provide safety and survey expertise as sub-contractor for waterborne dredging activities.

2006 to 2008: Surveyor for the Cooper River Bridge demolition, Charleston, SC.  Conducted On Hire and Off Hire surveys on all floating equipment, comprising over 30 tugs, barges, hopper scows and jack-ups.  Manage resulting claims for underwriters, including repairs on dry dock.

2006: Consultant for barge and tug operations during the rebuilding of bridges after Hurricane Katrina

2005- Present:   Lead AMSEA instructor of Immersion Suit training for commercial fisherman

2005:  Lead surveyor of an 82' fishing vessel grounding off the Coast of Nantucket Island.  Oversaw the salvage and removal of the vessel, and helped to protect environmental impact.

2004:  Consultant for salvage operations in Florida after Hurricanes Frances and Jeanne.

2003 - 2004        **Niemiec Marine**

**Boat Hauler, Diesel Mechanic, Vessel Repair Specialist**

Worked for a small boat repair facility with primary duties as Supervisor of Transportation of vessels on hydraulic trailers along

the entire Eastern Seaboard.  This expertise extended into working as a diesel mechanic and hull repair specialist on vessels of all type at this repair yard.

1996 - 2005     **Mattapoisett Fire Department**

**Volunteer Fire Fighter, Heavy Rescue**

Trained personnel in shipboard fire fighting, boat handling and oil recovery; certified medical first respondent.

1996 - 2003     **Brownell Systems, Mattapoisett, MA**

**Boat Hauler**

Specialized operator of hydraulic boat trailers in moving, hauling, launching, and blocking boats of all types along the entire Eastern Seaboard, including steel, fiberglass and aluminum.  Carried out heavy equipment and diesel engine maintenance and commenced working as a wood and fiberglass repair technician.

1992 - 1996 -   **Active Duty U.S. Coast Guard**

**Auxiliaries Engineer, Small Boat Engineer**

Serviced on active duty at various Coast Guard Stations including in the engineering department of 378' high endurance cutter in the Pacific Northwest, Alaska, and the South Pacific.  Worked in the engineering/auxiliaries department of this vessel responsible for transfer of fuel and oil and other mechanical maintenance items aboard this ship with an engineering department of over 50 personnel.   Duties were also as a Boarding Office for drug interdiction, detaining illegal immigrants, and fisheries violations

Transferred to U.S. Coast Station at Pt. Judith, RI, where he began a Certified Boat Coxswain, Engineer, and emergency response specialist.  Provided extensive oversight of a large spill involving a tug and barge during which time he received training in the incident command system.  He gained experience in the deployment and tending of oil containment boom and supervised the work of several boat crews in this capacity interfacing with civilian contractors providing spill response and clean up.

DANA P. COLLYER                                                                              4

**TRAINING**:        NAMS- CMS
                     U.S. Coast Guard (Engineer)
                     HAZ WOP Certified (40 hour)
                     ABYC Diesel Engine Certified
                     Ultrasonic Thickness Certified
                     USCG Fishing Vessel Safety Drill Conductor
                     AMSEA Level II Drill Instructor
                     Confined Space Training

# EXHIBIT 4

# Lost Economic Support Provided by Javier Sosa

In the Matter of the Complaint and Petition of CAPT. JUAN, INC.
As owner of the F/V CAPT. BILLY HAVER, for Exoneration from or
Limitation of Liability
CIVIL ACTION NO. 19-cv-10719-PBS

**Prepared by**

Peter K. Ashton

September 2021

**Lost Economic Support Provided by Javier Sosa**

## Introduction

At the request of counsel, I have been asked to provide an opinion as to the lost economic support provided by Javier Sosa.  It is my understanding that Mr. Sosa died while on board the *F/V Captain Billy Haver* on September 23, 2018.  Mr. Sosa was born on August 28, 1964 in Mexico, and he came to this country when he was a child and was a U.S. citizen.  Mr. Sosa had no education beyond the third or fourth grade and had worked as a commercial fisherman most of his life.  He lived in Virginia with his wife and had two grown children, neither of whom lived at home.

In preparing my analyses, I have relied on various records provided to me including Mr. Sosa's death certificate, the depositions of Graciela Sosa, Jose Araiza, and Juan Araiza, Mr. Sosa's tax returns for the years 2015-2017 and the expert report of Dr. Craig Moore.  I have relied on other studies, information, and data in the public domain which I cite to in this report.  These include data on worklife expectancy, inflation, interest rates, the value of household services and personal consumption expenditures.  For the work I have performed in this matter, I am being compensated at my hourly rate of $375.  Others who have assisted me bill at the rate of $175 per hour.  Attached with this report is a copy of my vita which includes cases in which I have recently testified.

In performing my work, I have applied generally accepted principles of economics and finance, and in particular, I have used accepted methods for computing lost earnings and lost economic support.  It is my understanding that loss of support includes the financial contributions made by the decedent to his or her dependents, in this case, Mrs. Sosa.  This also includes the monetary value of services the decedent provided. The financial contribution includes the value of Mr. Sosa's earnings capacity and is calculated by estimating the present value of what the deceased person could reasonably have expected to earn had he or she not died.  As explained more fully below, this earnings figure must be netted against a reasonable estimate of one's expected personal consumption and as noted considers the contribution made by the individual in performing household services.

## Lost Earnings

To determine Mr. Sosa's lost earnings one must determine his expected annual earnings had he not died and the length of time that he would be expected to continue to generate these earnings, i.e., when he would be expected to exit the workforce and retire, otherwise known as worklife expectancy.  Worklife expectancy takes into consideration one's probability of living as well as participation in the workforce and the possibility of unemployment.

While some economists simply assume a worker will continue to work in his or her profession until some assumed retirement date, this overlooks several important factors. First, it assumes continual employment and continual participation in the labor force without any periods of unemployment. It also assumes a 100% probability of survival until that retirement date which the data show is not true. Second, it overlooks the fact that commercial fishing is an extremely physical and strenuous occupation. For example, many crew members leave fishing and either retire or move on to other less demanding jobs. Finally, it fails to consider multiple sources of data that have been compiled on worklife expectancy which are most commonly used by forensic economists who perform lost earnings analyses. In a study, economist Thomas Ireland reported that the preferred method for determining the period of time over which earnings losses would have occurred in personal injury and wrongful death matters is the use of worklife expectancy data and tables, and only 7% of economists use a fixed retirement date or age.

In this case, Dr. Moore has elected not to calculate a worklife expectancy for Mr. Sosa although he states that it is "an important element in the analysis" of lost economic earnings and support.[1] Dr. Moore states that he was not asked to form an opinion regarding worklife expectancy, but rather calculates lost earnings through age 70. Nevertheless, it is part of the generally accepted lost earnings methodology for economists to compute worklife expectancy by some means to indicate the duration of lost earnings.[2] Indeed Richards and Donaldson have stated "worklife tables and the underlying mortality and labor force participation data they contain are one of the foundations of almost all forensic economic analyses that involved lost earnings."[3]

I have elected to use various sources of data on worklife expectancy to determine Mr. Sosa's worklife expectancy. I have applied data published in three different sources that measure actual worklife based on various attributes of the worker including education, age, race, sex, and work status.[4] In the case of Mr. Sosa, I determine that the end of his worklife expectancy would occur when he reaches 62.78 years of age.

It is important to note, however, that the worklife data reflect aggregated data across all occupations, and there have been no recent studies which evaluate worklife by profession.[5] The fishing industry generally, and deckhand work, in particular, is

---

[1] Craig Moore, "Economic Report" re Estate of Javier Sosa, August 26, 2021, p. 5.

[2] See Stanley Stephenson and David MacPherson, *Determining Economic Damages*, James Publishing, 2019, §701, §703 and §730.

[3] Hugh Richards and Michael Donaldson, *Life and Worklife Expectancies*, Lawyers and Judges Publishing Company, Inc., 2d Ed., 2009, p. 3.

[4] See Gerald Martin, *Determining Economic Damages*, James Publishing, 2011. Stanley Stephenson and David MacPherson, *Determining Economic Damages*, James Publishing, 2019. Hugh Richards and Michael Donaldson, *Life and Worklife Expectancies*, Lawyers and Judges Publishing Company, Inc., 2d Ed., 2009.

[5] The only study that did examine worklife expectancy by occupation was based on data from the 1980s and 1990s, and still aggregated the data across several different occupations and therefore does not focus exclusively on the fishing industry or more specifically work as a deckhand on a fishing vessel.

2

extremely physical and strenuous and one might expect that Mr. Sosa's worklife expectancy would be shorter, at least as it relates to his work as a commercial fisherman. This was confirmed in the deposition of Captain Jose Araiza who testified that Mr. Sosa was contemplating returning to Mexico at some point in the future as he was having problems with his leg and being on deck was bothering him as he got older and was getting slower in getting about the vessel.[6] This seemed particularly true since Mr. Sosa was now working as a deckhand whereas he formerly had been a Captain on various vessels.

**Lost Wages**

Mr. Sosa had worked as a commercial fisherman for many years both as a deckhand and as a Captain. It is my understanding that he was fired from his position as Captain on the *Carolina Queen* when the boat ran aground about two and a half years prior to the date of his death.[7] After that time, it is my understanding that he was employed as a deckhand. I have reviewed Mr. Sosa's tax returns for the years 2015-2017,[8] but I have excluded his earnings for the year 2015 since that reflects earnings when he was a Captain, and it is my understanding that he would no longer be hired as a Captain given this accident and his firing as Captain. To compute his earnings for 2018, I have averaged his net earnings (gross earnings net of business expenses) for 2016 and 2017 and I inflated them to 2018 dollars resulting in a figure of $131,238. For 2019 and 2020, I inflate this figure and then hold it constant thereafter as a measure of his lost earnings into the future. I then apply a tax factor based on his combined federal and state income tax percentage for 2016 and 2017 of 29.2% as a deduction for income taxes that would have been paid on his earnings which would be approximately $135,000 in the future.

In order to determine the present value of Mr. Sosa's lost earnings capacity, I discount the stream of future lost earnings using a real (inflation-adjusted) after-tax discount rate. As I have computed future losses in real dollars, it is appropriate to use a real discount rate. I use the average yield on 10 year Treasury bonds computed over the last 10 years, and deduct the rate of inflation from these yields over the last 10 years to derive a real discount rate of 0.37%. The lost future earnings must be discounted on an after-tax basis, and therefore I adjust the real discount rate to an after-tax basis (0.30%) and apply this rate to the future lost earnings of Mr. Sosa.

Dr. Moore has applied a negative rate of interest in discounting (actually inflating) his economic support values based on current market conditions using so-called TIPS rates. There are two issues with Dr. Moore's interest rate selection. First, he makes no adjustment for income taxes and second, he uses only values in

---

[6] Deposition of Jose Araiza, at 195-199.

[7] Deposition of Juan Araiza, at 372-376. Also see: https://www.nytimes.com/2016/04/17/nyregion/mayday-on-the-carolina-queen-off-the-rockaways.html?_r=0 which states that the *Carolina Queen* ran aground on February 25, 2016.

[8] It would be useful to have his partial year earnings for 2018 as well, however, I have not been provided with Mr. Sosa's tax return for 2018.

existence on a single day even though the discounting period includes up to twenty years when rates will change.  Dr. Moore cites to an article as support for his use of TIPS rates, however, the article itself notes the problem of using TIPS interest rates (which are pre-tax) when an after-tax rate is required.  The authors conclude that "[W]e come to the unexpected conclusion that the use of TIPS does not lend itself to a simple adjustment to the rate for taxes nor eliminate the need to consider expected inflation."[9]

Second, Dr. Moore's use of a negative interest rate throughout the future time period[10] fails to take into account the fact that market conditions are likely to change in the future and interest rates are expected to increase once again in the future.  Given the current environment, an investor would choose to convert existing securities to higher yielding securities in the future as real interest rates rise.  The yields on TIPS securities as with all U.S. government securities will fluctuate over time which is why it is appropriate to use historical averages as opposed to the rate of interest prevailing on a single date.[11]

**Personal Consumption Offset**

The calculation of economic loss in cases such as this also incorporates an additional element of value which acts to offset the lost earnings amount which is the personal consumption expenditures by the decedent.  The personal consumption offset represents the share of income that a decedent would have spent on oneself had he or she not died.  This amount would not have been available to others and since they would not have benefitted from this portion of the deceased's income, the estate has not lost this portion of income.  Thus, economists recognize that an estimate of these expenditures by the deceased must be excluded from the lost earnings computation.[12]

Personal consumption factors vary depending on the number of persons in the household, as well as the level of household income.  Generally, single person households spend a larger proportion of one's income on oneself, and families, particularly those with children, tend to spend a lower proportion of one's earnings on oneself.  In recent years, there has been an observed upward trend in personal

---

[9] Raymond Strangways, Bruce Rubin, and Michael Zugelder, "Using TIPS to Discount to Present Value," *Journal of Forensic Economics*, 25(1) (2014), p. 71 and p. 86.  Also see Kent Jayne, "Why Inflation-Indexed Treasury Securities Are Not Well-Suited for Discounting a Future Earning Stream," *Journal of Forensic Economics*, 11(1) (1998).

[10] Dr, Moore uses rates ranging from -0.40% to -1.74%.  These have the effect of substantially increasing the present value of his calculated losses. Table 3 of Dr. Moore's report shows, for example, that for the year 2031, although the calculated loss is $91,624, the present value of that loss is $104,129, *an increase* of 13.6%.

[11] For example, between 2011 and 2020, the average yield on the 10-year TIPS security has been 0.24% which is only slightly lower than the pre-tax interest rate of 0.37% which I use as my starting point to compute a discount rate.  During that same period of time, the 10-year TIPS rate has fluctuated from a minimum of -1.08% to a maximum of 1.39%.

[12] Dr. Moore recognizes this fact and also makes an exclusion for personal consumption, although as noted below, his offset is too low.

consumption expenditure factors.[13]   For example, the 2019 Ruble et al. study based on 2016-2017 data showed that for a two-person household with income of $100,000, the male family member would spend 20.3% of the household income on himself.  The 2014 study which was based on 2011-2012 data showed for the same income level and household size, the male member of the household spent 18.3% on himself of about 2% less.[14]

In the case of Mr. Sosa, he was living with his wife in a two-person household and he was the only wage earner.  The most recent studies indicate that with a household income of approximately $135,000, Mr. Sosa's personal consumption would be approximately 15%.[15]   Therefore, I apply a personal consumption offset to Mr. Sosa's earnings which is slightly more than $20,000 annually.  The future offset is also discounted to present value using the same discount rate as is applied to his earnings.

Dr. Moore has erred in his personal consumption calculation in two ways.  First, he has relied on a single, outdated source, namely the Patton-Nelson tables from their 2011-2012 study.  As noted above, those authors have released a more recent study, utilizing 2016-2017 data which shows an increase in personal consumption levels, and therefore by relying on an outdated study Dr. Moore has understated Mr. Sosa's personal consumption percentage.   Second, Dr. Moore applies the personal consumption offset to Mr. Sosa's after-tax earnings instead of his before tax earnings.[16]  The study that Dr. Moore relies on for his personal consumption data clearly states that the household income figure that the data are based on and thus should be used in calculating a personal consumption offset is a *pre-tax* income figure.[17]   By using an after tax, i.e., lower household income figure, Dr. Moore has understated in a second way the personal consumption offset.
.

**Lost Household Services**

Household services represent the value of services provided to an individual's household such as cooking, cleaning, grocery shopping, home maintenance, and the like.   It is important to recognize that the claim for lost household services relates directly to the types of services that the deceased had previously performed for the benefit of others in the household.  The standard method used by economists is to

---

[13] Michael Ruble, Robert Patton and David Nelson, "Patton-Nelson Personal Consumption Tables 2016-17," *Journal of Legal Economics*, 25(1-2), 2019, p. 81.

[14] Compare Table 3a from the two studies. Michael Ruble, Robert Patton and David Nelson, "Patton-Nelson Personal Consumption Tables 2016-17," *Journal of Legal Economics*, 25(1-2), 2019 and Michael Ruble, Robert Patton and David Nelson, "Patton-Nelson Personal Consumption Tables 2011-12," *Journal of Legal Economics*, 21(1), 2014.

[15] Michael Ruble, Robert Patton and David Nelson, "Patton-Nelson Personal Consumption Tables 2016-17," *Journal of Legal Economics*, 25(1-2), 2019; Michael Ruble, "Corrections to Patton-Nelson Personal Consumption Tables 2016-17," *Journal of Legal Economics*, 26(1-2) 202; Kurt Krueger, "Personal Consumption by Husbands and Wives," *Journal of Forensic Economics*, 2007.

[16] See Moore Report, p. 4 where he states he used the net income of $104,141 which as his Table 1 shows is an after-tax figure.

[17] See p. 41 and p. 44 of Michael Ruble, Robert Patton and David Nelson, "Patton-Nelson Personal Consumption Tables 2011-12," *Journal of Legal Economics*, 21(1), 2014.

identify the specific services that had been performed by the deceased, the number of hours devoted to such tasks, and a market wage to be applied to those tasks.

In addition to applying a market wage for the services that had been performed, one must also determine the number of hours that the deceased had been providing the household services. This generally requires an *ex post* estimate as the typical household does not track the number of hours one spends on such household activities.[18]

I have relied on the data on hours and market wage presented by Dr. Moore in his household service calculation to perform my own calculation. The only difference is the fact that I use the same discount rate as I use for the lost earnings and personal consumption offset calculation as opposed to the negative interest rate applied by Dr. Moore. I apply this calculation as Dr. Moore does until Mr. Sosa would have reached age 75.[19]

In his report, Dr. Moore indicates that he does not adjust his personal consumption offset figure for the fact that Mr. Sosa spent considerable time away from home living on a fishing vessel at sea. However, he fails to make the same point with regard to household services, although Mr. Sosa was unable to perform household services while fishing at sea, a fact noted by Mr. Sosa's widow in her deposition.[20] Therefore, it may be appropriate to reduce both the personal consumption offset and the lost household services calculations to account for this time at sea. Were one to reduce these figures to 50%, the total lost economic support figure would decline slightly, so I am being conservative, i.e., beneficial to the estate, by not decreasing these estimates for the time Mr. Sosa spent at sea.

**Summary of Lost Economic Support**

Based on the data, assumptions and analyses described above, my opinion to a reasonable degree of certainty in the field of economics is that the estate of Mr. Sosa suffered lost economic support of $848,712 in present value terms as shown in Table 1. Should additional data or information be forthcoming, I reserve my right to supplement my opinion.

---

[18] The government conducts surveys on the time typical household tasks require and economists have performed some analyses and compiled data on the time that such household tasks require and the value of such tasks. See Expectancy Data, *The Dollar Value of a Day*, 2016.

[19] Dr. Moore actually calculates the value of household services for four months past Mr. Sosa's 75th birthday as shown in his Table 4, even though he states he intended to calculate this loss "until Mr. Sosa is 75 years old" (Moore report, p. 8).

[20] Deposition of Graciela Sosa, at 47-49. She testified that Mr. Sosa spent more time at sea than he did at home.

**Table 1**
**Summary of Lost Economic Support Provided by Javier Sosa**

| | |
|---|---|
| But For Earnings | $655,655 |
| Lost Household Services (100%) | $193,057 |
| **Lost Earnings** | **$848,712** |

Peter K. Ashton
September 2021

## Peter K. Ashton

Peter K. Ashton is a self-employed consulting economist, and previously founded and was the president of Innovation & Information Consultants, Inc.  Prior to founding Innovation & Information Consultants, Inc., Mr. Ashton was a senior consultant with Putnam, Hayes & Bartlett, Inc. and Charles River Associates Incorporated.  He has directed major consulting projects for private clients as well as in the public sector and has testified as an economic expert in numerous fora including federal court, U.S. tax court, state and local courts in several different states, various regulatory agencies and before U.S. Congress and state legislative bodies.  Mr. Ashton's primary fields of expertise are the economic analysis of energy industries, regulatory and transportation economics, labor economics, valuation and transfer pricing issues.  A brief sample of Mr. Ashton's work in these areas includes the following.

### Regulatory Analysis, Expert Testimony and Litigation Support

- Mr. Ashton has prepared expert reports and testified on numerous occasions in cases involving the computation of lost earnings, lost profits, and other economic losses associated with wrongful death, personal injury and a variety of breach of contract claims and other claims of business loss.  He has estimated lost profits using various methods and he has also developed various models of earnings capacity in different professions.  He has also commented on the expert reports of others and provided assistance in the analysis of such reports, including cross examination of opposing experts.

- Mr. Ashton provided expert testimony before the Federal Regulatory Commission (FERC) on various issues related to a refined products pipeline's request for a rate increase in its regulated markets.  Ms. Ashton analyzed the rate design methodology employed by the pipeline's rate design expert and Ms. Ashton demonstrated how that rate design methodology led to cross subsidization between market-based rate destinations and regulated destinations.  He quantified the magnitude of the cross subsidization and offered an alternative approach to rate design that eliminated any subsidization.  In addition, Ms. Ashton criticized the approach taken by the pipeline to transfer certain regulated assets to a non-regulated entity and the corresponding charge-back fee that was assessed by the non-regulated entity to the regulated entity.  His testimony and advice to the client provided the basis for a successful settlement of the matter shortly prior to hearing.

- Mr. Ashton provided expert testimony regarding the fair market wage that would have been earned by a building property manager in the Greater Boston area pursuant to a breach of contract claim.  This work involved researching prevailing labor rates for various job classifications, as well as the employment prospects at the time the alleged breach occurred.  Mr. Ashton relied on public data as well as a survey and he made various adjustments to account for unique features of the job description.

- He opined regarding the just and reasonable rates for a major refined products pipeline system in California before the California Public Utilities Commission in two separate proceedings.  Mr. Ashton developed a cost of service model and projected future anticipated throughput as part of his rate analysis.  He criticized the rate of return model used by the pipeline's expert and showed that a reasonable rate of return was 250 basis points lower than claimed by the pipeline.   He also demonstrated that the overhead cost allocation model used by the pipeline was flawed and led to subsidization between regulated and unregulated affiliates.  Finally, he developed a rate design model and showed that just and reasonable rates should be 20-25% lower than what the pipeline was charging.

- He testified twice in U.S. Tax Court regarding the nature of the formula used to compute the Windfall Tax enacted by the U.K. government in 1997.  The issue was whether the tax was imposed on the difference between two values for recently privatized companies, and as a result whether the tax constituted a tax on value not a tax on income.  Mr. Ashton opined that the formula was indeed a valuation formula based on a market multiples or capitalized earnings valuation methodology and thus was a valuation tax not an income tax.  He also testified regarding generally accepted valuation methodologies commonly used in the appraisal business.

- Mr. Ashton prepared an expert report and testified regarding the value of crude oil produced in the Gulf of Mexico, and he evaluated the cost of transporting this crude oil to onshore marketing points.  He evaluated the prices reported by producers of crude oil in this area, and reviewed various transactions relating to this crude oil to determine the market value of this crude oil.  He developed estimate of damages in this matter as it relates to the proposer determination of the value of crude oil.

**Public Policy and Tax Issues**

- Mr. Ashton performed a detailed analysis of the impacts of deepwater royalty relief on leasing, exploration and production in the Gulf of Mexico.  This study involved the use of econometric models of MMS leasing behavior that analyzed the impacts of competition, royalty relief, changes in technology, movement in oil and gas prices and numerous other factors on lease bonus bids and the number of leases sold.  Ms. Ashton also projected future impacts of various royalty relief scenarios on royalty and lease bonus revenue as well as impacts on future exploration, development and production of oil and gas resources in the Gulf of Mexico.

- He has assisted various gasoline and heating oil dealers understand the causes for the recent price volatility, and the role that various factors including crude oil pricing, demand, speculation in futures trading, and others may have had on the increase in spot prices for these products at various points in time.  He also assessed various policy recommendations related to oil pricing volatility.

- Mr. Ashton completed an expert report valuing various intangible assets transferred by a domestic parent to various foreign corporations for purposes of developing an appropriate arm's length royalty rate consistent with the Section 482 transfer pricing regulations.  He examined the relative profitability contributed by these intangible assets domestically and also applied a CPM approach to the application of the intangibles in various foreign markets.  He also reviewed and assessed the Section 6662 transfer pricing report of the taxpayer.

- He analyzed the fair market value of the worldwide assets of a major multinational company for purposes of determining an appropriate method and basis for allocating interest expense under Section 861 of the IRS regulations.  Mr. Ashton has provided expert advice to the Treasury Department on this issue, pointing out the need for consistency with the relevant regulations and use of appropriate valuation methods.

- Analyzed the impact of various tax expenditure programs on small and large firms.  Mr. Ashton utilized detailed data from the Treasury to assess the impact on effective tax rates of various programs such as foreign tax credits, low income housing credit, accelerated depreciation, and the business means and entertainment tax deduction.

**Business Strategy Studies**

- Mr. Ashton recently completed a brand valuation for the United States Postal Service, commissioned by the Office of Inspector General. The study involved determining critical brand attributes of the Postal Service and subsequently determining a transparent, reproducible brand valuation. The study valued the brand at $3.63 billion, using a residual income approach.

- For an oil producer, Mr. Ashton evaluated a proposed sliding scale royalty agreement for leasehold interests that were pegged to future oil prices.  Mr. Ashton analyzed the most likely royalty payment under the proposed scheme given information on projections of crude oil prices, inflation and production costs over the next ten years.  He analyzed alternatives to the proposed royalty schedule and quantified the effect of these alternatives on the estimated royalty payments.

- Prepared a detailed study of crude oil marketing in the United States and changes which have occurred in the manner in which crude oil is bought, sold, and traded over the last twenty years.  Examined the manner in which crude oil is shipped throughout the country, and the impact of transportation alternatives on marketing options.  Also compiled a large database on spot and other relevant crude oil prices and data on quality adjustment factors for use in evaluating various crude oils.  Provided supplemental analyses regarding specific market areas in the United States including the Rocky Mountain producing area.

**Valuation and Transfer Pricing**

- Mr. Ashton completed the valuation of a minority interest in a Midwestern food processing company for gift tax purposes.  The valuation includes analysis of tangible and intangible assets, including marketing intangibles associated with key product lines.  He employed a discounted cash flow method to determine the fair market value of the minority, non-marketable interest.  He corroborated the results using a capitalized cash flow method and the guideline company method.

- Mr. Ashton has analyzed various cost sharing agreements in the pharmaceutical and medical products industries and associated buy-in and buy-out payments for the transfer of intellectual property related to these agreements.  Mr. Ashton has valued the intangible property under these agreements and estimating the reasonably anticipated benefits accruing from such intangibles.  He has computed running royalty payments and lump sum payments as compensation for the buy-in and buy-out payments.

- Mr. Ashton recently completed a project involving the assessment of stock-based compensation under Section 482. The project involved assessing whether stock-based compensation represented an economic cost subject to cost sharing. He directed a comprehensive search of third-party cost sharing and collaboration agreements to determine the extent to which parties include stock-based compensation as a part of jointly funded costs.  As part of the same project, he also analyzed the valuation and assessment of reasonably anticipated benefit shares related to the cost sharing agreement of a large, multinational technology firm. Ms. Ashton's principal responsibilities included the evaluation of the methods used to compute the reasonably anticipated benefit shares and an assessment of service transactions related to the transfer pricing methodology.

- Mr. Ashton completed an expert report valuing various intangible assets transferred by a domestic parent to various foreign corporations for purposes of developing an appropriate arm's length royalty rate consistent with the Section 482 transfer pricing regulations.  He examined the relative profitability contributed by these intangible assets domestically and also applied a CPM approach to the application of the intangibles in various foreign markets.  He also reviewed and assessed the Section 6662 transfer pricing report of the taxpayer.

- He analyzed the fair market value of the worldwide assets of a major multinational company for purposes of determining an appropriate method and basis for allocating interest expense under Section 861 of the IRS regulations.  Mr. Ashton has provided expert advice to the Treasury Department on this issue, pointing out the need for consistency with the relevant regulations and use of appropriate valuation methods.

- Mr. Ashton analyzed the value of a large portfolio of marketing and product development intangibles subject to intercompany licensing agreements subject to

the Section 482 regulations.   As part of this engagement, Ms. Ashton was responsible for development and assessment of economic transfer pricing models designed to assess the arm's length royalty rate for the license of trademarks, trade names, confidential product formulae, and other related intangible assets from a U.S. multinational company to foreign subsidiaries.   These methods include assessment of the CUT and CPM approaches, as well as development of a return on net assets (residual income approach), market capitalization approach and residual profit split approach.

- Mr. Ashton was recently involved in a transfer pricing analysis under the Section 482 regulations requiring the determination of an arm's length royalty for the license of both marketing and technology intangibles provided by a foreign multinational to a U.S. taxpayer.   Consideration was given to both a bundled and unbundled approach to valuing the licensed intangibles and determination of the best method under the regulations.   Mr. Ashton was responsible for developing and testing appropriate valuation models to determine the arm's length nature of an established intercompany royalty rate between the foreign parent company and a U.S. subsidiary.

Mr. Ashton received an A.B. degree in Economics and Political Science from Colby College (*magna cum laude* and *Phi Beta Kappa*) in 1976, and he received an M.I.A. degree in International Economics and Business from the School of International Affairs at Columbia University in 1978.

**Publications and Speeches (Last 10 years)**

 "The Crude Oil Price Bubble of 2008: The Role of Speculators and Devalued Dollars," with Meghan O. Law, IIC, Inc. Working Paper, 2009; updated 2011.

*Valuation of the U.S. Postal Service Brand*, with Lee O. Upton and Emma J. Broming, prepared for the Office of Inspector General of the U.S. Postal Service, January 2015; report RARC-WP-15-005.

**Testimony (last 4 years)**

*Alfred Harrington v. Blue Water Fisheries, Inc.*, Civil Action No. 2:17-cv-00455-GZS, expert report, May 2018, and deposition, August 2018.

*In the Matter of the Tariff Revision, Designated as TL34-306, Filed by Kenai Pipe Line Company for Tariff Changes,* Direct Testimony, August 2018. Regulatory Commission of Alaska.

*Maine Maritime Academy v. Janis Fitch and Sodexo Operations*, Civil Action No.17-cv-00195-NT, Direct testimony, November 2019.

*Epsilon Trading et al., v. Colonial Pipeline Company,* Dockets OR18-7-002, OR18-12-002, OR18-17-002, OR18-21-002, OR19—1-001, OR19-4-001, OR19-16-001, OR19-20-000, OR19-27-000, Consolidated, Direct testimony re Cost of Service Issues, September 2019; Rebuttal Testimony, March and April 2020; and Direct Testimony re Market Based Rates, October 2019 and Rebuttal Testimony on Market-Based Rates, April, 2020.  Cross examination on Cost of Service and Stand Alone Cost Issues, September 2020. Cross examination on Market-Based Rate Issues, November, 2020.