No *Shepard's* Signal™
As of: March 1, 2022 3:59 AM Z

# *Bradley v. Cicero*

United States District Court for the District of Massachusetts

January 28, 2021, Decided; January 28, 2021, Filed

Civil Action No. 18-30039-MGM

**Reporter**
2021 U.S. Dist. LEXIS 15818 *; 2021 WL 294286

DANIEL BRADLEY, Plaintiff, v. CHRISTIAN CICERO, JOSEPH DUNN & DANIEL MOYNAHAN, Defendants.

**Counsel:** [*1] For Daniel Bradley, Plaintiff: Peter A. Slepchuk, LEAD ATTORNEY, Law Offices of Peter Slepchuk Jr., Springfield, MA.

For Christian Cicero, Defendant: Kevin B. Coyle, LEAD ATTORNEY, Springfield, MA.

For Joseph Dunn, Defendant: Jeremy Saint Laurent, City of Springfield, Springfield, MA.

For Daniel Moynahan, Defendant: Jeremy Saint Laurent, City of Springfield, Springfield, MA; Lisa C. deSousa, Law Department, City of Springfield, Springfield, MA.

**Judges:** MARK G. MASTROIANNI, United States District Judge.

**Opinion by:** MARK G. MASTROIANNI

## Opinion

MEMORANDUM AND ORDER REGARDING DEFENDANTS' MOTION FOR A NEW TRIAL

(Dkt. No. 126)

January 28, 2021

MASTROIANNI, U.S.D.J.

I. INTRODUCTION

After a two-day trial, a jury returned a verdict for Plaintiff Daniel Bradley on various counts of civil rights violations against officers Joseph Dunn and Daniel Moynahan ("Defendants")[1]. It awarded damages of $180,000 against Dunn and $45,000 against Moynahan, including both compensatory and punitive damages. Defendants have moved for a new trial. Their motion raises issues of qualified immunity, the standard for a lawful pat frisk, improper closing arguments by Plaintiffs counsel, and the introduction of prior trial testimony by unavailable witnesses. [*2] For the reasons discussed below, their motion for a new trial will be denied.

II. BACKGROUND

Joseph Dunn and Daniel Moynahan are police officers in the Springfield Police Department. So is Christian Cicero, another defendant who the jury found not liable for any wrong. On August 25, 2015, at around 2:00 a.m., Cicero and Dunn stopped a vehicle which Daeshavana Robinson was driving. Plaintiff Daniel Bradley was seated in the back behind the passenger's seat. Savon Tucker was next to him behind the driver's seat. In the front passenger seat was Barbara Murphy. Cicero and Dunn radioed for backup and Moynahan arrived on the scene.

---

[1] The trial involved a third defendant, Christian Cicero. Because the motion is by Dunn and Moynahan, "Defendants" will be used to refer to those two defendants.

Cicero asked Robinson for her driver's license and registration. She gave her license and the rental agreement for the car, which had expired and did not list her as an authorized driver. Meanwhile, Dunn and Moynahan positioned themselves in the area of the rear passenger door. Dunn's and Moynahan's version of events was as follows. Dunn and Moynahan saw Plaintiff make a left-to-right movement ending towards the doorjamb area. Their testimony was this indicated Plaintiff could be hiding drugs or a weapon, neither of which were ultimately found in the car or on Plaintiff. **[\*3]** Dunn requested Plaintiff to step out but Plaintiff refused to comply. Dunn therefore had to escort Plaintiff out of the car.

Plaintiff was then leaned against the car trunk. Moynahan attempted a pat frisk of Plaintiff which included the groin area per normal procedure. Dunn and Moynhan testified about Plaintiff's resistance to the pat frisk, which included trapping Moynahan's hand against the car with the hips. Moynahan denied he had manipulated Plaintiff's genitals. Dunn then unsuccessfully attempted to handcuff Plaintiff while telling him he was under arrest. He was initially unsuccessful because, according to him, Plaintiff kicked him in the shin. Once handcuffed, Dunn moved Plaintiff to the rear passenger side of his cruiser while Plaintiff resisted. At the door of the cruiser, Dunn lost his grip on Plaintiff, who was moving about, so that Plaintiff fell face first into the doorjamb area. At some point, Moynahan had heard the commotion at the cruiser and joined Dunn, although at the rear door on the driver's side with an obstructed view of Plaintiff and Dunn. Plaintiff was eventually placed in the cruiser. Throughout this time, according to his testimony, Cicero's attention was **[\*4]** directed mainly on the driver and the other occupants. Cicero noticed at one point a brief struggle between Plaintiff, Dunn, and Moynahan but did not see what had caused it.

The events according to Plaintiff, Robinson, and Tucker differ significantly from Dunn's and Moynahan's version.[2] They were coming from a get-together when they were stopped. Plaintiff testified he had been smoking marijuana that evening and had drank some alcohol. They all testified that Plaintiff did not make any shifting movements, the officers did not make any initial request for him to step out of the car and, instead, the officers immediately yanked Plaintiff out. Plaintiff testified that during the pat frisk Moynahan grabbed his genitals, which surprised Plaintiff, causing him to speak up. According to Plaintiff, he did not shove his body up against the car or the officers, try to run away, or kick anyone. Robinson and Tucker testified Plaintiff was thrown against the car when taken out of it, and Robinson testified Plaintiff was beat up. Neither Robinson or Tucker saw an officer being kicked or heard an officer saying he had been kicked. At the cruiser, Plaintiff testified Dunn punched him in the mouth, which **[\*5]** is how Plaintiff fell into the cruiser. When he looked up from the fall, he thought he saw two officers. He was kicked several times on the back area and then was pushed into the cruiser.

Plaintiff was brought by Dunn and Cicero to the Springfield Police Department where he was booked. His booking photo shows an open wound on his lip. In a video of the booking, Plaintiff exhibits a calm demeanor and immediately requests upon arrival to speak to a captain to report assault. At one point, he implores Cicero, who is waiting in the booking room with him, to speak up about what had happened. Plaintiff's medical intake records from the jail indicate a laceration on his lip and bruising and pain in his back.

The jury returned a verdict for Plaintiff against both Dunn and Moynahan for conducting an unreasonable seizure by means of threats, intimidation, or coercion; unlawfully arresting Plaintiff without probable cause; false arrest; and false imprisonment. In addition, it returned a verdict against Moynahan for unlawfully

---

[2] Testimony by Robinson and Tucker was admitted by the reading of transcripts from the underlying state criminal trial against Plaintiff.

conducting a pat frisk without reasonable suspicion that Plaintiff was armed and dangerous. And against Dunn, the verdict was he had used excessive force in effecting a seizure **[*6]** or arrest of Plaintiff; committed an assault and battery on Plaintiff; and initiated criminal proceedings against Plaintiff with malice and without probable cause. The jury awarded $60,000 in compensatory damages and $120,000 in punitive damages against Dunn. It awarded $15,000 in compensatory damages and $30,000 in punitive damages against Moynahan.

III. STANDARDS FOR JUDGMENT AS A MATTER OF LAW AND NEW TRIAL

Under *Federal Rule of Civil Procedure 59*, the court may override a jury verdict and order a new trial "if the verdict is against the law, against the weight of the credible evidence, or tantamount to a miscarriage of justice." *Teixeira v. Town of Coventry ex rel. Przybyla, 882 F.3d 13, 16 (1st Cir. 2018)* (internal quotation marks omitted). "A district court's power to grant a motion for a new trial is much broader than its power to grant a JMOL" under *Federal Rule of Civil Procedure 50*. *Jennings v. Jones, 587 F.3d 430, 436 (1st Cir. 2009)*. The court is free to independently weigh evidence. *Id.* However, the court "cannot displace a jury's verdict merely because [it] disagrees" or "because a contrary verdict may have been equally . . . supportable." *Id.* (internal quotation marks omitted). The "remedy of a new trial is sparingly used, and then only where there would be a miscarriage of justice and where the evidence preponderates heavily against the verdict." *U.S. v. Merlino, 592 F.3d 22, 32 (1st Cir. 2010)* (internal quotation **[*7]** marks omitted).

Although Defendants do not raise a motion for judgment as a matter of law, the court deems the issue of qualified immunity to be properly analyzed as if raised by such a motion under *Federal Rule of Civil Procedure 50*. *Rule 50* "is one of the judicial control devices provided by the Federal Rules of Civil Procedure so that the district court may enforce rules of law. It allows the court to remove from the jury's consideration cases or issues when the facts are sufficiently clear that the law requires a particular result." 9B C. Wright & A. Miller, Federal Practice and Procedures § 2521 (3d ed.); *Weisgram v. Marley Co., 528 U.S. 440, 447-48, 120 S. Ct. 1011, 145 L. Ed. 2d 958 (2000)*. A "verdict should be set aside only if the jury failed to reach the *only* result permitted by the evidence." *Lestage v. Coloplast Corp., 982 F.3d 37, 46 (1st Cir. 2020)*. "[F]acts are construed in the light most favorable to the jury verdict," and "any inferences are drawn in favor of the non-movant." *Blomquist v. Horned Dorset Primavera, Inc., 925 F.3d 541, 546 (1st Cir. 2019)*. The court does not evaluate the credibility of witnesses or the weight of the evidence. *Id.*

IV. DISCUSSION

A. QUALIFIED IMMUNITY

Defendants' first argument is they are immune from liability under the doctrine of qualified immunity. Although Defendants' motion is styled solely as a request for a new trial (they assert they are "entitled to qualified immunity and a new trial is in order" **[*8]** (Defs.' Mem. 10, Dkt. No. 127)), the court views the issue to be more properly considered as a request for judgment as a matter of law under *Rule 50(b)*. That is because a new trial makes little sense in the context of Defendants' qualified immunity arguments. If Defendants are entitled to qualified immunity from liability (and from suit[3]), a trial is unnecessary. Moreover, the availability of qualified immunity, at this post-trial stage, is a question of law for the court's judgment. *Raiche v. Pietroski, 623 F.3d 30, 35 (1st Cir. 2010)*

1. *Legal Standard*

"The doctrine of qualified immunity protects government officials 'from liability for civil

---

[3] Because qualified immunity is an immunity from suit rather than a mere defense to liability, it is effectively lost if a case is erroneously permitted to go to trial." *Pearson v. Callahan, 555 U.S. 223, 231, 129 S. Ct. 808, 172 L. Ed. 2d 565 (2009)* (internal quotation marks omitted).

damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.'" *Pearson, 555 U.S. at 231* (quoting *Harlow v. Fitzgerald, 457 U.S. 800, 818, 102 S. Ct. 2727, 73 L. Ed. 2d 396 (1982))*. To overcome qualified immunity requires that (1) "a public official has violated a plaintiff's constitutionally protected right" and (2) "the particular right that the official has violated was clearly established at the time of the violation." *Raiche, 623 F.3d at 35, 40* (noting, also, that MCRA claims are subject to the same standard of immunity for police officers as claims under *§ 1983*). With respect to the second, "clearly established" prong, the court must analyze "(a) [*9] whether the legal contours of the right in question were sufficiently clear that a reasonable official would have understood that what he was doing violated that right, and (b) whether the particular factual violation in question would have been clear to a reasonable official." *Díaz-Bigio v. Santini, 652 F.3d 45, 50 (1st Cir. 2011)*. "The salient question is whether the state of the law at the time gave a defendant 'clear notice that what he was doing was unconstitutional.'" *Id.* (quoting *Decotiis v. Whittemore, 635 F.3d 22, 37 (1st Cir. 2011))*.

"When a qualified immunity defense is pressed after a jury verdict, the evidence must be construed in the light most hospitable to the party that prevailed at trial." *Iacobucci v. Boulter, 193 F.3d 14, 23 (1st Cir. 1999)*. And "deference should be accorded to the jury's discernible resolution of disputed factual issues." *Id.* In other words, the facts are viewed in the light most favorable to the verdict. *Jennings, 499 F.3d at 7, 11 n.12*. The "availability of qualified immunity after a trial is a legal question informed by the jury's findings of fact, but ultimately committed to the court's judgment." *Raiche, 623 F.3d at 35* (quoting *Acevedo-Garcia v. Monroig, 351 F.3d 547, 563 (1st Cir. 2003))*.

2. Analysis

As mentioned, Defendants' motion does not explicitly identify the arguments on qualified immunity as a motion for judgment as a matter of law governed by *Rule 50*. It may be because, "as the name implies, a renewed motion for [*10] judgment as a matter of law under *Fed. R. Civ. P. 50(b)* is bounded by the movant's earlier *Rule 50(a)* motion." *Parker v. Gerrish, 547 F.3d 1, 12 (1st Cir. 2008)* (original alteration omitted) (internal quotation marks omitted). And neither Dunn or Moynahan raised at trial a *Rule 50(a)* motion for judgment as a matter of law, much less one based on qualified immunity.[4] As a result, they have

---

[4] In a different section of the motion (III.B) from the one addressing qualified immunity (III.A), Defendants mention "the need for a new trial because of *the improper denial of Defendants' qualified immunity argument at the time of trial*." (Defs.' Mem. 10, Dkt. No. 127 (emphasis added).) Counsel did briefly mention qualified immunity during the charging conference in a colloquy on the pat frisk standard and *Torres-Pagan* (a case discussed in more detail later in this opinion):

> Mr. Saint Laurent: I believe that case was decided after this occurred. At the very least a question of qualified immunity would be raised whether the office - the officers would not have been aware and the question of whether it's clearly established law at the time of this stop would.
>
> ...
>
> Mr. Saint Laurent: I think the [Supreme Judicial] Court's mistake would then be imputed on the officers. If the Court is not clearly defining a law how are the officers supposed to be clearly interpreting the [*11] law, I think that raises a question of qualified immunity. There's no way the officers can know what the law is and how it's clearly defined by the highest court if the Court is not doing a good job of defining it.

(2/20/20 (Morning) Trial Tr. 19:23-20:2, 20:16-22, Dkt. No. 110.) The court concluded the standard had always been armed and dangerous and the jury instructions would state that standard. Counsel for Defendants noted his continued objection. (*Id.* 21:24-25.)

His objection was to jury instructions. Although motions for judgment of law had already been made the day before by Plaintiff and Defendant Cicero (2/19/20 Trial Tr. 55:14-15, 64:6-8), with the case not submitted to the jury yet, counsel for Defendants should have explicitly raised a motion for judgment as a matter of law based on qualified immunity after the court ruled on the jury instructions. See *Jones ex rel. United States v. Mass. Gen. Hosp., 780 F.3d 479, 487 (1st Cir. 2015)* ("*Rule 50(a)(2)* requires that a party first file a motion for judgment as a matter of law 'any time before the case is submitted to the jury.' *Fed. R. Civ. P. 50(a)(2)*.")

waived the defense as grounds for a post-trial *Rule 50(b)* motion for judgment as a matter of law. *Isom v. Town of Warren, 360 F.3d 7, 9 (1st Cir. 2004)* (noting the qualified immunity issue was waived); see also *Cornwell Entm't, Inc. v. Anchin, Block & Anchin, LLP, 830 F.3d 18, 25-26 (1st Cir. 2016)* (holding that the district court had erred in granting a *Rule 50(b)* motion based on qualified privilege when the argument was not properly preserved by a 50(a) motion).

Although the issue of qualified immunity is clearly waived, the court addresses the underlying merits because they relate to another asserted ground for a new trial, one based on erroneous jury instructions, which is discussed later. Defendants' argument rests on the state of the law regarding pat frisks under the *Fourth Amendment of the United States Constitution* and *Article 14 of the Massachusetts Declaration of Rights*, both of which protect against unreasonable searches and seizures. In a decision issued a month before trial in this case, the Supreme Judicial Court of Massachusetts noted its past articulations of the pat frisk standard had not always been clear, possibly causing confusion. *Commonwealth v. Torres-Pagan, 484 Mass. 34, 138 N.E.3d 1012, 1016-17 (Mass. 2020)*.[5]

Defendants argue *Torres-Pagan*, then, stands for the fact that the particular pat frisk standard requiring reasonable belief a person is armed and dangerous (as opposed to reasonable concern for officer safety) was not clearly established at the time of the incident in August 2015, and qualified immunity applies to Defendants. **[*12]**

Plaintiff argues any possible confusion could have been only with respect to the state law standard under *Article 14*, and not with respect to the federal law standard under the *Fourth Amendment* as articulated by the Supreme Court **[*13]** in *Terry v. Ohio, 392 U.S. 1, 88 S. Ct. 1868, 20 L. Ed. 2d 889 (1968)*. The court agrees that the federal standard for pat frisks was clearly established and controlled by Supreme Court precedent at the time of the incident.

But, in addition, the court views the state law standard to have been clearly established notwithstanding the language in *Torres-Pagan*. The Supreme Judicial Court has consistently stated that the state standard is consistent with that of *Terry*. In 1969, the Supreme Judicial Court acknowledged in *Commonwealth v. Matthews, 355 Mass. 378, 244 N.E.2d 908 (Mass. 1969)* that a "State is free to

---

A "party must spell out its arguments squarely and distinctly . . . or else forever hold its peace." *Parker, 547 F.3d at 13* (internal quotation marks omitted) (holding that Defendant had not preserved his motion for judgment as a matter of law based on qualified immunity where his arguments were not specifically directed to or addressed all of the prongs of a qualified immunity analysis); *id. at 12* ("The movant cannot use [a 50(b) motion] as a vehicle to introduce a legal theory not distinctly articulated in its close-of-evidence motion for a directed verdict." (internal quotation marks omitted)). Without having made a motion for judgment as a matter of law based on qualified immunity, Defendants did not properly present all of the law and facts for the court to decide the issue. *Fed. R. Civ. P. 50(a)(2)* ("The motion must specify the judgment sought and the law and facts that entitle the movant to the judgment."). Accordingly, the court deems Defendants to have waived qualified immunity for purposes of a *Rule 50* motion.

[5] The Supreme Judicial Court stated:

> Although for the most part we have articulated the patfrisk standard correctly, see, e.g., *Commonwealth v. Villagran, 477 Mass. 711, 717, 81 N.E.3d 310 (2017)*, and *[Commonwealth v.] Narcisse, 457 Mass. at 7, 927 N.E.2d 439 [(Mass. 2010)]*, in isolated instances we have conflated the standard required to perform a patfrisk with the standard require for issuing an exit order. For example, we have stated, inaccurately, that the standard for a patfrisk is the same as that which is required to justify an exit order. See *Commonwealth v. Torres, 433 Mass. 669, 676, 745 N.E.2d 945 (2001)*. In addition, we mistakenly have described a patfrisk as being "constitutionally justified when an officer reasonably fears for his own safety or the safety of the public . . . or when the police officer reasonably believes that the individual is armed and dangerous" [emphasis added]). *Commonwealth v. Johnson, 454 Mass. 159, 162, 908 N.E.2d 729 (2009)*, quoting *Commonwealth v. Isaiah I., 450 Mass. 818, 824, 882 N.E.2d 328 (2008)*.
>
> We acknowledge that these differing articulations of the patfrisk standard may have caused confusion. However, we never have strayed intentionally from the armed and dangerous standard as articulated in *Terry*. Accordingly, we clarify today [when an exit order and a pat frisk are justified].

*Torres-Pagan, 138 N.E.3d at 1016-17* (first square brackets alteration in original) (internal footnotes omitted).

develop its own law of search and seizure to meet the needs of local law enforcement . . . . 'It may not, however, authorize police conduct which trenches upon Fourth Amendment rights, regardless of the labels which it attaches to such conduct.'" *Id. at 910* (quoting *Sibron v. New York, 392 U.S. 40, 60-61, 88 S. Ct. 1889, 20 L. Ed. 2d 917 (1968)*). It recognized *Terry* requires a police officer to have reason to believe an individual is armed and dangerous in order to conduct a lawful pat frisk. *Id.* (citing *Terry, 392 U.S. at 27*). And as it stated in *Torres-Pagan*, the Supreme Judicial Court never intentionally strayed from that standard. *138 N.E.3d at 1017*. Furthermore, even when potential confusion was developing in state court decisions, the law as applied aligned with the federal standard of armed and dangerous. In the cases the Supreme Judicial Court calls **[*14]** out as inaccurately stating the standard, the analysis was still ultimately grounded in the question of a suspect being armed. *See id. at 1017* (citing *Johnson, Isaiah I.*, and *Torres*).[6] Later, in 2010, in *Commonwealth v. Narcisse, 457 Mass. 1, 927 N.E.2d 439 (Mass. 2010)*, the Supreme Judicial Court again confirmed the application of the *Terry* standard under *Article 14*, noting "the Supreme Court of the United States recently reaffirmed, a 'stop and frisk [is] constitutionally permissible if two conditions are met," the second condition being "to proceed from a stop to a frisk, the police officer must reasonably suspect that the person stopped is armed and dangerous.'" *Id. at 444* (alteration in original) (quoting *Arizona v. Johnson, 555 U.S. 323, 326-27, 129 S. Ct. 781, 172 L. Ed. 2d 694 (2009))*.

Although there have been a few Supreme Judicial Court which inaccurately stated the standard and the court appreciates Defendants' arguments regarding confusion, the court finds the law was clearly established at the time of the incident at issue here. Specifically, that law was that a pat frisk is unconstitutional without an officer's reasonable belief a person is armed and dangerous as set out in *Terry*, the state standard follows the federal standard and, moreover, the state standard is necessarily constrained by the limits of what is permissible under the **[*15]** Federal Constitution.

B. JURY INSTRUCTION

Defendants next assert they are entitled to a new trial because of erroneous jury instructions. "An erroneous jury instruction warrants a new trial if the preserved error, based on a review of the entire record, can fairly be said to have prejudiced the objecting party." *Thomas & Betts Corp. v. New Albertson's, Inc., 915 F.3d 36, 52 (1st Cir. 2019)* (internal quotation marks omitted).

Defendants' first argument again focuses on the standard for pat frisks and the Supreme Judicial Court's misstated articulations of the standard as discussed in *Torres-Pagan*. They contend that because the standard at the time of the incident, before *Torres-Pagan*, was a lower one of reasonable concern for officer safety rather than reasonable suspicion that a suspect is armed and dangerous, the jury instructions should have stated the former standard. The court rejects this because, for reasons already discussed, *Torres-Pagan* did not newly establish the armed and dangerous standard for a pat frisk. Consequently, Defendants' second argument that a new trial is needed because liability for excessive force may have been grounded on an erroneous finding of an unlawful pat frisk also fails.[7] Defendants do not elaborate on

---

[6] *See Commonwealth v. Johnson, 454 Mass. 159, 908 N.E.2d 729, 732-33 (Mass. 2009)* ("Two questions arise in connection with a determination whether a police officer had a sufficient, reasonable basis to conduct a patfrisk: . . . and (2) did the officer have a reasonable basis to suspect that this party was likely to be armed and dangerous."); *Commonwealth v. Isaiah I., 450 Mass. 818, 882 N.E.2d 328, 334 (Mass. 2008)* ("Based on the juvenile's actions both inside and outside the store, Doogan drew the reasonable inference that the juvenile had a weapon and thus was dangerous. Therefore he was justified in conducting a patfrisk."); *Commonwealth v. Torres, 433 Mass. 669, 745 N.E.2d 945, 951 (Mass. 2001)* ("The danger of an armed passenger was present until the occupants were pat frisked for weapons, and disarmed.").

[7] Moreover, Plaintiff is correct that the verdict plainly shows the jury did not find Dunn liable for an unlawful pat frisk (Verdict Form P 2, Dkt. No. 124) and, therefore, an unlawful pat frisk could not have

how the issue of the pat [*16] frisk standard affects the need for a new trial on "all issues" in addition to excessive force (Defs.' Mem. 10, Dkt. No. 127), and the court does not discern how it could.

Defendants' third argument relates to the instructions on an unreasonable search or seizure under *Article 14*. The court instructed the jury that "a lunge or other furtive gestures is usually insufficient, by itself, to render a search reasonable. However, such movements are a relevant factor to consider in determining the reasonableness of a patfrisk, and in general must be considered under the totality of all circumstances as you find they developed at the time." (2/20/20 (Morning) Trial Tr. 55:16-17, Dkt. No. 110; Jury Instructions 40, Dkt. No. 108.[8]) Defendants argue that instructing the jury that a furtive movement is insufficient to lawfully search an occupant of a vehicle is incorrect as a matter of law and prejudicial.

The court does not see any error. The Supreme Judicial Court has said a "lunge or other furtive gesture is usually insufficient, by itself, to render a search reasonable. . . . Such a movement, however, is relevant in determining whether there is probable cause." *Commonwealth v. Prophete, 443 Mass. 548, 823 N.E.2d 343, 348 (Mass. 2005)* (quoting *Commonwealth v. Concepcion, 10 Mass. App. Ct. 613, 616 , 411 N.E.2d 477 n.2 (Mass. App. Ct. 1980))*. The court's instruction [*17] is consistent with that statement of the law.

Nevertheless, Defendants elaborately argue that if a movement is deemed furtive by an officer, then by definition an officer has made a determination informed by the circumstances that the person making the movement is likely attempting to conceal an unlawful or dangerous item. Defendants point out movements that would typically be considered innocuous in another setting, such as sitting in own's driveway or having just finished shopping for groceries, are often times considered furtive during a traffic stop or other encounters with police. And those movements, "[d]uring a traffic stop, at night, in a high crime area . . . would rightfully be considered to be furtive. Any reasonable people officer would conclude that the occupant is either retrieving or hiding something. Thus, a reasonable officer could surmise that the occupant is armed and dangerous and fear for his/her safety." (Defs.' Mem. 12, Dkt. No. 127.)

But nighttime, a high crime area, and a traffic stop do not automatically, in and of themselves, transform movement that would not justify an exit order or search in the daytime in a grocery lot into a reasonable basis for an exit [*18] order or search. As the First Circuit noted in *U.S. v. McKoy*, that kind of reasoning "comes too close to allowing an automatic frisk of anyone who commits a traffic violation in a high-crime area." *428 F.3d 38, 40 (1st Cir. 2005)* (upholding the district court's finding that the defendant's nervous movements of leaning and reaching towards the center console during a traffic stop in a high-crime area to be an insufficient basis for a pat frisk); *see also Commonwealth v. Meneus, 476 Mass. 231, 66 N.E.3d 1019, 1025 (Mass. 2017)* ("[J]ust being in a high crime area is not enough to justify a stop," and "[c]itizens are entitled to the protections of the Federal and State Constitutions, despite the character of the area." (internal quotation marks omitted)).

The court's instruction directing the jury to apply a totality of the circumstances analysis was consistent with the law. Furthermore, the court does not find the jury's verdict to show itself to be the result of some unfair prejudice by being against the weight of the evidence. Conflicting testimony by Defendants, Plaintiff, and other witnesses was subject to the jury's weighing and credibility determinations. The jury could have discredited Defendants' testimony regarding Plaintiffs' movements or the implications of those movements, thus [*19] allowing it to find an

---

been the jury's basis for finding Dunn liable for use of excessive force (*id.* PP 6, 13). And the jury did not find Moynahan liable for use of excessive force. (*Id.* P 7, 14.)

[8] The jury had with them hard copies of the instructions to refer to during deliberations.

unlawful pat frisk had occurred.

C. CLOSING ARGUMENTS

Defendants' argue that counsel for Plaintiff made improper arguments during closing warranting a new trial. The inquiry for improper conduct or argument by counsel is an examination of "the totality of the circumstances, including (1) the nature of the comments; (2) their frequency; (3) their possible relevance to the real issues before the jury; (4) the manner in which the parties and the court treated the comments; (5) the strength of the case; and (6) the verdict itself." *Granfield v. CSX Transportation, Inc., 597 F.3d 474, 490 (1st Cir. 2010)*.

1. *Reasonable Suspicion*

The first issue involves the fact no weapon was found when the officers conducted their search and how that fact bears on the propriety of the officers' exit order and pat frisk. Plaintiff's counsel argued:

> What's even more important is that the police didn't find anything. They searched Daniel. They didn't find any weapons; they didn't find any contraband. They found nothing on him.
>
> They searched that doorjamb area supposedly that area where Daniel was sitting. They didn't find a weapon. They didn't find anything. So use your common sense and ask yourselves, if there was nothing there, nothing to take, nothing to hide, [*20] why would Daniel make a movement like that? Why would he be reaching? He wouldn't. He didn't. He didn't make any such movement. Officer Dunn was untruthful about this reaching movement because he had to justify the exit order somehow.

(2/19/20 Trial Tr. 104:11-23, Dkt. No. 117.) Defendants assert this argument was without legal basis. As they point out, the issue had been discussed during arguments earlier in the day when the court denied Plaintiff's *Rule 50(a)* motion, noting "the legitimacy and the legality of a patfrisk is not based upon if something was or was not found. That would be absurd." (*Id.* 62:23-25.) After closing arguments, the court again noted "arguing that nothing was found in the car goes to reasonable suspicion being supported or not supported as absurd." (*Id.* 129:18-130:8.) Plaintiff's counsel stated he had not intended to misstate the law but, rather, his point went to the credibility of Dunn's testimony on Plaintiff's movements. (*Id.*)

Consistent with the argument made in court, Plaintiff's opposition notes that whether Plaintiff made a movement as described by Dunn was a disputed factual issue. Plaintiff, his companions, and Officer Cicero testified they did not see any movement [*21] by Plaintiff, in contrast to Dunn (and Moynahan). Plaintiff argues because reaching was disputed, the jury had to decide whether to credit the testimony of Dunn (and Moynahan[9]). The fact nothing existed for him to be reaching for, he argues, tends to support his claim that he did not make a reaching motion and that Dunn's observation of movement was pretextual. As an aside, Plaintiff "readily acknowledges that had the reaching not been in dispute, it would not have been appropriate to comment on the fact that no weapons or contraband were found." (Pl.'s Mem. 10 n.8, Dkt. No. 129.)

The argument is extremely subtle, and the court still finds it to precariously flirt with confusing the jury as to the law. Nevertheless, the court disagrees with Defendants that those closing remarks warrant a new trial. Foremost, the court explicitly instructed the jury on the issue.

> As to reasonable suspicion, when considering any police action which must be justified by reasonable suspicion, a later finding that there is no dangerous weapon or finding of criminality should have absolutely no impact as to your finding as to whether reasonable suspicion existed before the police took the

---

[9] Plaintiff's brief characterizes Moynahan's testimony as corroborating the lack of any movement by Plaintiff. That is arguable but, ultimately, does not change any outcome for this motion.

action.

(2/20/20 (Morning) **[*22]** Trial Tr. 48:7-12, Dkt. No. 110); Jury Instructions 31, Dkt. No. 108). *See* [Hatfield-Bermudez v. Aldanondo-Rivera, 496 F.3d 51, 64 (1st Cir. 2007)](#) ("The granting of a mistrial is a last resort, and the trial court's usual remedy for an impropriety will be to give a curative instruction. . . . The normal presumption is that a jury will follow a court's curative instruction." (internal quotation marks omitted)); [U.S. v. Glover, 558 F.3d 71, 78 (1st Cir. 2009)](#) ("A specific curative instruction can mitigate the damage of an improper comment, . . . and the content of the jury instructions can remedy the effects of problematic language employed in the closing argument . . . ." (internal citations omitted)). In addition, the court instructed:

> Opening statements or closing arguments may have commented on some of these rules, but if what was said about the law differs in any way from my instructions, you must be guided only by the instructions on the law as I state them.

(2/20/20 (Morning) Trial Tr. 28:14-18, Dkt. No. 110.)

Although Plaintiff counsel's comment bore directly on a central issue of whether Defendants had reasonable suspicion for the exit order and pat frisk, the court does not find it was the type of error irremediable by clear instructions from the court regarding the standard as well as the necessity **[*23]** for the jury to follow the law as given to it by the court. In addition, the evidence viewed under the correct legal standard clearly given by the court could have supported the ultimate verdict by the jury.

2. *Racial Profiling*

The second issue raised by Defendants is Plaintiff's closing argument that the incident between Defendants and Plaintiff occurred because of racial profiling. Plaintiff's counsel had argued in his closing:

> Now, when you're back there deliberating one of you might say, well, if they didn't stop for the stop sign, if Daniel wasn't making these supposed movements, then what was this all about? Why did the officers stop the car? Why would the officers take Daniel out of the car and search him?
> Well, it was late at night. It was a bad neighborhood. You heard all from every officer about how bad this neighborhood was; about, oh, the drugs and the guns and the violent crimes that are in this neighborhood, late at night, bad neighborhood.
>
> The officers come upon a car occupied by four young African-Americans and they want to investigate and we'll see what was going on with this car. Maybe they got some contraband in the car; maybe we're going to catch them riding dirty as **[*24]** it's said. So they stopped the car.
> They come upon it and they see three females and one male, Daniel. He's the obvious target. Let's pull him out and see if we can find anything on him. Of course, they find nothing. This was profiling, ladies and gentlemen, pla[i]n and simple.

(2/19/20 Trial Tr. 104:24-105:19, Dkt. No. 117.)

Defendants argue that Plaintiff's counsel lacked any evidentiary support, there was no evidence the officers knew the race of any of the vehicle's occupants before stopping it, there was no evidence Plaintiff was singled out by race, and in fact all of the occupants were African-American. They state the burden on such issue was on Plaintiff, note that no corrective instruction specific to the issue was given, and argue the inflammatory argument was irremediable.

Plaintiff's brief responds that despite Defendants' insistence that his counsel injected a racial component into the case, counsel never once used the word racial profiling. Instead, the argument goes, counsel argued profiling based on the bad nature of the neighborhood. This is a disingenuous argument as the court already observed at the time of trial. (*Id.* 121:2-13.) That aside, the court agrees

with Plaintiff **[*25]** that his counsel's allusion to racial profiling is not a basis for a new trial.

First, to be clear, the burden was not on Plaintiff to prove racial profiling. Neither racial profiling nor motive is an element of or a direct violation of any of the counts, in contrast to, for example, an Equal Protection claim based on selective enforcement of motor vehicle laws based on race, or a claim of employment discrimination motivated by race. Moreover, Plaintiff's counsel was allowed to address motive as an argument particularly in response to Defendants' counsel raising the issue of motive in closing arguments:

> The theory of the plaintiff in this case is that the defendants I guess made all this up, concocted all this for what reason we don't know. They didn't know who was in that car so it's not as though they had some grudge or some prior interaction with Mr. Bradley or anyone in the car.
> I believe Mr. Bradley testified he had no previous interactions with any of the officers involved in this case. So I guess you would have to think that they just cooked it all up. For what? They're bored? I don't know what motive would explain that, but it also would be a pretty bad concocted story.

(*Id.* 87:4-15.) **[*26]**

In addition, notwithstanding the absence of testimony directly addressing racial profiling or bias, there was sufficient basis for Plaintiff's counsel to make his argument. Plaintiff, who took the witness stand, is an African-American man, and the officers who asked him to exit the vehicle, pat frisked him, disputedly punched him, and also took the witness stand, were white men. In the overall context of the trial testimony and evidence, including the jury's role in assessing the witnesses' demeanors and credibility, the jurors were permitted to consider the potential significance of race. Although the court considered it to be a close issue in the midst of trial, the court views it differently in retrospect. The potential effect of race on interactions and impressions between the police and a civilian, and in fact between any person and another, is a consideration for application of commonsense scrutiny and one that is rooted in reality. Finally, the Defendants' argument that Plaintiff could not have been singled out by race because his companions were three African-American women also fails. The argument relies on a narrow view of what constitutes being singled out by race. An improper **[*27]** act can be racially driven even if it is not inflicted on every person of that race, and the jury was permitted to draw such a conclusion.

It is true the court did not provide any additional instructions that specifically addressed the racial profiling argument. However, the court's instructions included the following:

> Before I give the instructions, what I wanted to talk to you about or mention to you, as I do in all cases, was in regard to the closing arguments in this case. Now, you recall that I told you that closing arguments and opening statements are not evidence and they are not evidence. Closing arguments and opening statements are given by, in this case as you have seen, professional and zealous advocates that are advocating for their respective sides to persuade you to see the evidence as they see the evidence.
>
> If at any time during closing arguments any of the parties appealed to your emotions or tried to inflame your passions in order to try to get you to make a decision on a certain issue based upon that emotion or that inflamed passion or that appeal to something that you may feel passionately or emotionally or may hit a psychological c[h]ord for you, that's fine if you **[*28]** find and you think there is evidence to support such an argument.
>
> If closing arguments were made and raised issues that appealed to you and are unsupported by the evidence, then you are to be guided by the evidence, by the evidence, in this case. Closing arguments are not evidence. All right?

(2/20/20 (Morning) Trial Tr. 25:13-26:8, Dkt. No. 110.)

> You must determine the facts without fear or favor, based solely on a fair consideration of the evidence and without bias or prejudice to any party. Our system of law does not permit jurors to be governed by appeal to sympathy, prejudice, or public opinion, or the appeal to political righteousness or patriotism.

(2/20/20 (Morning) Trial Tr. 27:9-15, Dkt. No. 110; Jury Instructions 6, Dkt. No. 108.)

> Arguments and statements by attorneys are not evidence. They are not witnesses. What they say in their opening statements and closing arguments is intended to help you interpret the evidence, but it is not evidence. If the facts as you remember them from the evidence differ from the way they have stated them (or the way the Court has referenced them), your collective memory of the facts should control.

(2/20/20 (Morning) Trial Tr. 30:6-12, Dkt. No. 110; **[\*29]** Jury Instructions 10, Dkt. No. 108.) Especially in light of these instructions, the court does not find that the reference to profiling made by Plaintiff's counsel warrants a new trial. *Cf. [Forrestal v. Magendantz, 848 F.2d 303, 309-10 (1st Cir. 1988)](#)* (holding that a court's instructions discussing objectivity, impartiality, sympathy, prejudice, and bias "effectively nullified the effect of the Golden Rule argument.").

3. *Patriotism*

For similar reasons, the court is not persuaded by Defendants' third argument that Plaintiff counsel's closing argument could be interpreted to have invoked patriotism in support of punitive damages and is reason for a new trial. Plaintiff counsel's arguments were:

> The second category of damages that you may award are called punitive damages. The point of punitive damages is not to compensate. It's different. The point of punitive damages is deterrence. To deter the defendants from acting like this in the future.
> . . .
> Ladies and gentlemen, the right to be free from unreasonable search and seizure, it's a sacred right. Our Founding Fathers fought a war to obtain that right, and since then much blood has been shed to preserve that right.
>
> Every day people from all over the world come to this country in search of the protections **[\*30]** of the [Fourth Amendment](#) and [Article 14](#). In totalitarian countries like China and North Korea, they don't have the [Fourth Amendment](#). They don't have [Article 14](#). In those countries the police can stop you, ask you for your documents, detain you, arrest you without justification, without legal recourse, but not here, not in America. We're better than that.
>
> The question for you is, what is it worth? What is this right worth? If it's worth nothing, then we might as well be living in China or North Korea. If it's worth nothing, then the right ceases to exist. Because if there is no consequence, if there's no accountability when police officers violate the [Fourth Amendment](#) or [Article 14](#), they won't be deterred. The unlawful practices will continue. Other people will see that, hey, we can get away with this too and there's a snowball effect until the right ceases to protect anyone.
> You, as the jury, are the conscience of the community. You have the awesome responsibility here today granted by the Constitution to speak with one voice on behalf of the community.

(2/19/20 (Morning) Trial Tr. 112:25-113:4, 113:15-114:17.) As the court previously noted, the length to which Plaintiff's counsel spoke about other countries, China, patriotism, and things **[\*31]** of the like was an unnecessary and inappropriate appeal to sympathy and inflaming of passion. But the court believes its instructions fully addressed the issue. (2/20/20 (Morning) Trial Tr. 25:13-26:8, 27:9-15, Dkt. No. 110 ("Our system of law does not permit jurors to be governed by . . . the appeal to

political righteousness or patriotism."); Jury Instructions 6, Dkt. No. 108.)

Moreover, on damages, the court specifically instructed:

> If you find that punitive damages are appropriate, you must use reason in setting that amount. Punitive damages, if any, should be in an amount sufficient to fulfill their purpose but should not reflect bias, prejudice or sympathy toward any party. In considering the amount of punitive damages, consider the degree of reprehensibility of each Defendant's conduct.

(2/20/20 (Morning) Trial Tr. 71:7-12, Dkt. No. 110; Jury Instructions 60-61, Dkt. No. 108.) Finally, the court disagrees with Defendants that Plaintiff was awarded grossly excessive damages.

D. USE OF PRIOR TESTIMONY TRANSCRIPTS

Defendants' final issue relates to the use of prior testimony transcripts. Plaintiff's companions, Robinson and Tucker, had testified in the prior state-court criminal trial **[*32]** brought against Plaintiff arising from the same incident at issue in this case. Plaintiff had been charged with assault and battery on a police officer and resisting arrest. Their testimony at that trial was read into the record in this trial. Defendants argue it was improper hearsay that did not fall within the exceptions governed by *Federal Rule of Evidence 804*.

1. *Legal Standard*

*Federal Rule of Evidence 804* provides that former testimony is not excluded as hearsay under certain conditions. The declarant must be unavailable under *Rule 804(a)*. In addition, the testimony must have been given at a trial, hearing, or lawful deposition, and "is now offered against a party who had—or, in a civil case, whose predecessor in interest had—an opportunity and similar motive to develop it by direct, cross-, or redirect examination." *Fed. R. Evid. 804(b)(1)*.

Regarding unavailability, a declarant is considered unavailable if they are "absent from the trial or hearing and the statement's proponent has not been able, by process or other reasonable means, to procure: . . . the declarant's attendance, in the case of a hearsay exception under *Rule 804(b)(1)*." *Fed. R. Evid. 804(a)(5)*.[10]

Regarding the requirement of an opportunity and similar motive to develop testimony previously or by a predecessor in interest, the First Circuit **[*33]** has noted there must be "sufficient identity of issues to ensure that cross examination in the former case was directed to the issues presently relevant, and that the former parties were the same in motive and interest." *Holmquist v. Farm Family Cas. Ins. Co., 800 F. Supp. 2d 305, 310 (1st Cir. 2011)* (quoting *Hicks Co. v. Commissioner, 470 F.2d 87, 90 (1st Cir. 1972))* (indicating an agency relationship is not a necessary prerequisite to qualifying as a predecessor in interest); *see also Kam-O'Donoghue v. Tully, No. 16-11054-MLW, 2019 U.S. Dist. LEXIS 154264, 2019 WL 4273686, at *3 n.2 (D. Mass. Sept. 10, 2019)*. "The party against whom the prior testimony is offered must have had a *similar*, not necessarily an *identical*, motive to develop the adverse testimony in the prior proceeding." *Holmquist, 800 F. Supp. 2d at 310* (quoting *U.S. v. Bartelho, 129 F.3d 663, 671 (1st Cir. 1997))*. Assessing "similar motive" is a two-part test of "whether the questioner is on the same side of the same issue at both proceedings, and whether the questioner had a substantially similar interest in asserting that side of the issue." *Id.* (quoting *Bartelho, 129 F.3d at 671-72*).

2. *Facts*

Plaintiff's counsel had effectuated in-hand service of trial subpoenas on Robinson and Tucker for the initial trial date in this case of February 10, 2020. Neither witness contacted Plaintiff's counsel after being served with the trial subpoena despite being requested to do so. The court had to reschedule trial to February 18, 2020, and counsel received

---

[10] Defendants' brief discusses law regarding *Rule 804(b)(5)* governing residual exceptions, which is something separate from *Rule 804(a)(5)* on unavailability and not an applicable provision in this case. (Defs.' Mem. 16, Dkt. No. 127.)

notice **[*34]** of the rescheduling on January 29, 2020. Plaintiff's counsel then attempted to serve subpoenas for the new trial date. The Deputy Sheriff of the Hampden County Sheriff was unable, despite several attempts, to complete in-hand service. Neither witness appeared in court on February 10, the date of the initial subpoena. In addition, during the discovery phase of litigation, neither party had succeeded in deposing the witnesses although both parties had served deposition subpoenas and even despite the fact the court had granted a motion by Defendants to compel the depositions. Tucker had also told Plaintiff's counsel on several occasions in the past that she would not appear for a deposition or come to court. (Slepchuk Affidavit, Dkt. No. 85-5; 2/11/20 Trial Tr. (Redacted) 16:22-20:8, Dkt. No. 114.)

Plaintiff filed a motion in limine to admit the prior trial testimony of Robinson and Tucker. (Dkt. No. 84.) The court allowed the motion after finding both witnesses to be unavailable and the requirement of *Rule 804(b)(1)(B)* met. (Electronic Order, Dkt. No. 90.)

At trial, the following was read from Robinson's previous direct testimony. (2/20/20 Trial Tr. 127:12-135:12, Dkt. No. 116.) Earlier in the night of **[*35]** the incident, she had been at a get-together with Plaintiff and the other occupants. She was driving the vehicle and did not remember if she had stopped at a stop sign before the traffic stop. One officer took her license and the rental agreement, and the others flashed their lights inside the vehicle. She did not see Plaintiff reach for the center console, waistband, or door, nor slump his shoulders forward. The officers pulled Plaintiff aggressively out of the car. Plaintiff was then thrown up against the car and beaten by the officers. At no time did she see Plaintiff kick an officer or hear an officer saying he had been kicked.

On cross-examination (*id.* 135:20-141:13), which was also read into the record, the Commonwealth had elicited testimony that Robinson had been drinking, again that she did not remember if she stopped at the stop sign, and that she had not been looking back at Plaintiff while talking with the officer taking her license. She was questioned about when exactly she turned around, what side of the car Plaintiff was leaned up against, whether she could see Plaintiff's legs, and when and where she saw Plaintiff being beat up.

Tucker's direct testimony was as follows. **[*36]** (*Id.* 141:15-147:8.) She was at the get-together. She was seated in the back seat of the vehicle behind the driver, next to Plaintiff. She did not recall Robinson driving through any stop sign. She described Plaintiff to have been calm and not moving around and did not see him reach for the center console, waistband, or the door. Tucker said the officers asked Plaintiff for his ID and at some point opened his door, forcefully grabbed him out of the car, slammed him against the car, and emptied his pockets into the back seat. She also did not see Plaintiff kicking any officer.

On cross-examination (*id.* 147:12-153:13), the government elicited that Tucker had been drinking at the get-together, Plaintiff had not been drinking, an open bottle of alcohol was in the car, and Tucker had been drinking it. The government questioned if, before Plaintiff was pulled out of the vehicle, whether he had first been asked, to which she responded in the negative. She was questioned about whether she had seen him fall over that night (no), whether she stayed in the vehicle while Plaintiff and the officers were interacting (yes), and whether Plaintiff was already in the officer's cruiser when she exited **[*37]** the vehicle (yes). In addition, she confirmed that though she did not see Plaintiff kick anyone, she couldn't see below the waist level from where she sat inside the car. Nor did she have a clear view of the officers' legs. She did not see officers punch Plaintiff or throw him to the ground, but she did see them shove him against the car. She answered in the negative when asked if Plaintiff shoved back, struggled when handcuffed, or attempted to run away when handcuffed. Finally,

on redirect (*id.* 153:17-19), she testified she did not hear any officer say he had been kicked.

3. *Analysis*

The court continues to find Robinson and Tucker were unavailable. Although they were not served new subpoenas for the updated trial date, all indications pointed to their unwillingness to appear even if subpoenaed. See [Atl. Specialty Ins. Co. v. Coastal Envtl. Grp. Inc., 945 F.3d 53, 70 (2d Cir. 2019)](#) (applying [Fed. R. Evid. 804(a)(5)](#) and [(b)(1)(A)](#) in holding that "[g]iven [declarant's] refusal to appear under subpoena and that the testimony was taken under oath during a deposition, the admission of the evidence instead appears to be a faithful application of Federal Rule of Evidence.").

Likewise, the court still finds that the prior trial testimony satisfied [Federal Rule of Evidence 804(b)(1)(B)](#) as being offered against a party who had a predecessor in **[*38]** interest with an opportunity and a similar motive to develop that testimony. In prosecuting a charge of assault and battery on a police officer, "in circumstances where the evidence supports a claim of excessive or unnecessary force by police and the concomitant right to self-defense," "the Commonwealth must prove beyond a reasonable doubt that the police did not engage in excessive force, as well as that the defendant did not act in self-defense." [Commonwealth v. Graham, 62 Mass. App. Ct. 642, 818 N.E.2d 1069, 1078 (Mass. App. 2004)](#). "Under the resisting arrest statute and general law, a person has a right to resist by reasonable force an arrest carried out by police with excessive or unreasonable force . . . ." [Commonwealth v. Urkiel, 63 Mass. App. Ct. 445, 826 N.E.2d 769, 772 (Mass. App. Ct. 2005)](#). If there is evidence of excessive or unnecessary force by police in making an arrest, again it is the Commonwealth's burden to prove beyond a reasonable doubt that the police did not use such force. [Id. at 775](#). In light of these issues, the Commonwealth had an interest and motive to thoroughly cross-examine Robinson and Tucker regarding the officers' treatment of Plaintiff and Plaintiff's behavior, given both witnesses testified that the officers had aggressively grabbed Plaintiff out of the car without first asking and slammed him against the car. That is evident **[*39]** in the cross-examination the Commonwealth in fact undertook: undermining the credibility of their testimony, whether by the fact they had been drinking or that they did not have a clear view of Plaintiff or Defendants, and pointedly eliciting what admissions it could of actions by the officers the witnesses did not in fact see. The similarity of the underlying factual issues, and of the motive the Commonwealth and Defendants had in developing adverse testimony on those issues, fulfills the requirements of [Federal Rule of Evidence 804(b)(1)(B)](#). The reading of Robinson's and Tucker's testimony therefore fell within an exception to the exclusion of hearsay and does not warrant a new trial.

V. CONCLUSION

For the reasons set forth above, Defendants' motion for a new trial (Dkt. No. 126) is DENIED.

It is So Ordered.

/s/ Mark G. Mastroianni

MARK G. MASTROIANNI

United States District Judge

**End of Document**