UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

```
_____
                                      )
In re:                                )
CAPTAIN JUAN, INC., as owner of the   )
F/V CAPTAIN BILLY HAVER,              )        Civil Action
                                      )        No. 19-cv-10719-PBS
                      Petitioner.     )
_____ )
```

### FINDINGS OF FACT, CONCLUSIONS OF LAW, AND ORDER

June 08, 2022

Saris, D.J.

### INTRODUCTION

On September 23, 2018, First Mate Javier Rangel Sosa was murdered on the F/V Captain Billy Haver ("Billy Haver"), a scallop fishing vessel owned by Petitioner Captain Juan, Inc. A fellow crew member stabbed him twelve times with a fishing knife and struck another crew member on the head with a hammer. Petitioner commenced this action pursuant to 46 U.S.C. § 30505, seeking exoneration from, or limitation of, any liability it may face in connection with the attacks. In response, Sosa's widow filed a claim alleging eight counts: four under the Jones Act for negligence (Counts I, III, V, and VII) and four under general maritime law for unseaworthiness (Counts II, IV, VI, and VIII).

After a three-day bench trial, the Court finds that the Billy Haver was unseaworthy as a result of the violent nature of the murderer and that Sosa's death was caused by the unseaworthiness

of the Billy Haver, but that Petitioner had no knowledge of and was not privy to the violent nature of the crew member or of his drug usage. The Court concludes that Petitioner is entitled to have its liability limited to the value of the vessel, and that the value of the vessel and its appurtenances includes its scalloping permit. Accordingly, the liability is limited to $6,165,968.75.

**FINDINGS OF FACT**

I.   **The Parties**

Petitioner Captain Juan, Inc., a corporation organized in the state of Virginia, has two officers: Juan Araiza ("Mr. Araiza"), the president and treasurer, and his wife, Debra Haver, the secretary. The Petitioner owned and operated the F/V Captain Billy Haver. The Captain of the Billy Haver is Jose Araiza ("Captain Araiza"), Mr. Araiza's brother.

Claimant Graciela S. Sosa is the widow of the first mate of the Billy Haver, Javier Rangel Sosa. She is suing on behalf of the estate, herself, and her two sons.

Another crewmember, Rafael Herrera, who is from Newport News, Virginia, was also attacked. He filed (and subsequently settled) a claim against Petitioner.

## II.   __The Murder__

On September 18, 2018, the Billy Haver departed from Seaford,
Virginia, and steamed for sixty hours toward the fishing grounds
on Georges Bank, east of Nantucket Island. The crew then commenced
scallop fishing operations. It had seven crew members: Captain
Araiza, First Mate Sosa, Juan Zamorano, Herrera, Julio Munoz Diaz,
Efrain Villareal, and Franklin "Freddy" Meave Vazquez. During the
trip, Vazquez engaged in odd behavior. One morning, Captain Araiza
asked members of the crew why they were laughing at Vazquez. They
explained that Vazquez had accused them of taking his pants, but
Vazquez was in fact wearing his pants. Additionally, Vazquez
frequently visited the restroom.

The morning of the murder, on September 23, 2018, while
Captain Araiza was serving breakfast, Vazquez entered the galley
complaining that he had hurt his knee, but he refused to show the
Captain his knee and instead returned to his bunk, walking
perfectly normally. About twenty minutes later, he reemerged and
said he would be going back to work. Captain Araiza then went to
bed around 11:00 am.

Later that day, in the early afternoon, in the cutting house
on the back deck, Diaz, Herrera, and Vazquez were shucking the
scallops. Sosa was nearby on the deck and Zamorano and Villareal
were in the fish hold. Vazquez was trembling. He asked Herrera for

a cigarette and later, unprovoked, hit him in the back of the head with a five-pound sledgehammer. Vazquez proceeded to stab and slice at Sosa multiple times in the head, neck, arms, hands, and torso with a ten to twelve-inch fishing knife, which was part of the equipment on board.

Diaz ran to wake up Captain Araiza. The Captain tried running outside, but the door from the galley to the deck had been latched shut from the outside. He ran around another way and came upon Vazquez holding a hammer and a knife. Captain Araiza swung a heavy plastic bucket at Vazquez, hitting him in the head and causing him to drop the knife. Struggling with Vazquez, Captain Araiza then grabbed a steel bar. Vazquez climbed up the mast.

Captain Araiza went to check on Sosa, who was unconscious. Meanwhile Vazquez perched in the crow's nest, hitting the equipment with his hammer. Herrera helped Zamorano and Villareal escape from the fish hold, where they had been trapped by six or seven baskets of scallops placed on the exit door. A nearby cruise ship took Herrera and Sosa off the boat to seek medical assistance. The Coast Guard removed Vazquez from the boat. Sosa died.

### III. **Earlier Trips with Vazquez**

Captain Araiza had worked with Vazquez twice before. He first fished with Vazquez two years earlier on another vessel. Vazquez was a good worker, and he did not appear to be argumentative,

violent, or on drugs. Based on that experience, Captain Araiza hired Vazquez as a crewmember for the Billy Haver on a trip beginning on August 21, 2018. That trip lasted seven to ten days. Again, the trip went well.

During the trip, Vazquez got along with the crew members and was able to do his work. Herrera did not observe any behavior that would lead him to believe Vazquez was a violent individual, other than once yelling over the engines at Sosa to hurry up. Ex. 126 at 25:7-29:5. Herrera did observe Vazquez with a personal knife in his boot, which he did not use. One time, in the restroom, Herrera saw Vazquez with lines of something that looked like drugs on the sink. Vazquez would often go to the bathroom. Id. at 32:23-34:11. While Vazquez was likely on heroin, no crew member told Captain Araiza during the August trip that Vazquez was using drugs. The crew on the Billy Haver worked together for three or four days before the trip on September 18, 2018, doing gear work to prepare for the voyage without problem.

**IV.   Hiring Practices**

Captain Araiza was in charge of hiring the crew of the Billy Haver. His brother, Mr. Araiza, the president of Captain Juan,

Inc., was not involved in hiring; neither was Mr. Araiza's wife, Debra Haver, the secretary.

Captain Juan, Inc. had no formal policy or procedures for hiring. Captain Araiza tried to hire people he had already worked with, and if not, people he knew had worked on other boats. If he was in a pinch, he would hire someone looking for work on the docks. If he did not know the crewmember, he would interview them to learn if they knew how to do the work of a deckhand on a scalloping vessel. He did not ask potential crew members if they had a criminal record, check any references, or conduct drug tests of crew members. Captain Juan, Inc. performed drugs tests on its captains for other vessels, but not on any crew members. There is no evidence it was a custom in the local fishing industry in Newport News to perform drug tests on crew members.

Crew members were asked to certify that they had no injury, illness, or other medical problem which would prevent them from performing their assigned duties and to assert that they were not bringing any firearms or drugs onboard the vessel. Captain Araiza explained that he did not want to hire anyone who would do drugs on board because they would not be able to do the work, would be

a danger to the boat, and most likely would force him to return to dock.

One key disputed issue of fact is whether Captain Araiza knew that Vazquez was on drugs when he hired him for the September trip. At a deposition, Herrera testified that he observed fellow crew member Zamorano tell Captain Araiza at the ship supply store that Vazquez was on drugs, and that the Captain should leave him and hire a replacement. Ex. 126 at 39:24-41:15. Herrera, who is from Mexico, spoke limited English at the deposition and he did not appear for trial. Captain Araiza testified at trial that no such conversation occurred. There is nothing to corroborate either account, but, between the two, Captain Araiza's account is more credible. As Captain Araiza explained at trial, he would have had no reason to take Vazquez on "a closed trip" in which the number of scallops to be caught was limited, and the catch proceeds had to be divided among the crew. For closed area trips, Petitioner was incentivized to minimize the number of crew members because bringing an additional crew member would not increase the amount of scallops caught and would instead decrease each crew member's share of the profits.

Herrera also testified that Vazquez had a reputation in Newport News for quitting on fishing trips when he ran out of drugs and became dope sick. Ex. 126 at 146:1-147:5. However, there is no

evidence that Captain Araiza, Mr. Araiza, Debra Haver, or any agents of Captain Juan, Inc. knew about his reputation.

### V.    The F/V Captain Billy Haver

The F/V Captain Billy Haver is an eighty-two-foot, steel-hulled commercial fishing vessel built in 1996 and assigned the U.S.C.G. Documentation Number 1038916. Captain Juan, Inc. bought the vessel in 2002 (without a permit) for $450,000. A marine surveyor for Excellence in Marine Consulting ("EIMC"), a marine risk management and claims investigation company, estimated the "as is" value for the vessel in "fair market" to be $1.1 million, both on September 20, 2016, and on January 10, 2020. See Ex. 11 and 12. This value includes the equipment and machinery, but not the scalloping permit. The hull was insured for $1 million. See Ex. 14. Mr. Araiza, who is an extremely experienced shipowner, testified that the value of the Billy Haver, excluding its permit, is about $1 million. Mr. Araiza based his opinion on the EIMC survey and on his experience. He captained vessels from 1980 to 2004, has bought and sold vessels, and owns three other vessels. Based on this evidence, the value of the Billy Haver and its equipment and machinery at the end of its voyage, excluding its permit, was $1.1 million.

The Billy Haver customarily engaged in scallop fishing in the Atlantic Ocean off the northeast coast of the United States. It

possesses National Marine Fisheries Northeast Federal Fishery Permit # 330793 (the "Permit"), issued pursuant to 16 U.S.C. §§ 1801 et seq. and 5101, which permitted the vessel to harvest Atlantic sea scallops in accordance with the National Marine Fisheries Atlantic Sea Scallop – Limited Access – Full Time plan. This Permit was not possessed by the Billy Haver when Petitioner purchased the vessel; after purchase Petitioner successfully petitioned to transfer the Permit to the Billy Haver from a sunken vessel it had owned, the F/V Carolina Breeze. According to Mr. Araiza, based on his experience as a shipowner buying and selling vessels, the Permit is worth about $5 million. The value of the Permit is undisputed.

Per federal regulation, this type of permit is presumed to run with the vessel:

> The fishing and permit history of a vessel is presumed to transfer with the vessel whenever it is bought, sold, or otherwise transferred, unless there is a written agreement, signed by the transferor/seller and transferee/buyer, or other credible written evidence, verifying that the transferor/seller is retaining the vessel's fishing and permit history for purposes of replacing the vessel.

50 C.F.R. § 648.4(a)(2)(i)(D) (citing 50 C.F.R. § 648.4(a)(1)(i)(D)). The permit is tied to the vessel's fishing history and based on the vessel's size and horsepower, such that, while the permit can be transferred to a replacement vessel, see 50 C.F.R. § 648.4(a)(2)(i)(A), the replacement vessel's horsepower

cannot exceed the vessel's horsepower by more than twenty percent and its length cannot exceed the vessel's length by more than ten percent. 50 C.F.R. § 648.4(a)(2)(i)(E) (citing 50 C.F.R. § 648.4(a)(1)(i)(E)). The permit "must be carried, at all times, on board the vessel for which it is issued." 50 C.F.R. § 648.4(l).

The Permit dictated the limits on the vessel's activities. The vessel was permitted to take "open area" and "closed area" trips. On an open trip, the vessel was not limited in the amount of scallops caught, but these trips were limited to a certain number of days per year. On a closed area trip, the amount of scallops caught was limited to 18,000 pounds, which could be caught over the course of more than one trip. As mentioned, the September trip was a closed area trip.

At the end of the trip where Sosa was murdered, on September 26, 2018, the pending freight on the vessel was $65,968.75 worth of scallops. See Ex. 116.

VI. **Subsequent Criminal Proceedings**

The Court takes judicial notice that after Vazquez was charged with his crimes, he filed a motion for a competency evaluation and was found to be suffering from a mental disease or defect rendering him mentally incompetent to understand the nature and consequences of the proceedings and assist properly in his defense. United States v. Franklin Freddy Meave Vazquez, 1:18-cr-10428-ADB, ECF

No. 68 (Mar. 11, 2020). The court committed Vazquez to the custody of the Attorney General for hospitalization in a suitable facility. Almost two years later, the court concluded that Vazquez had become competent to stand trial. Id., ECF No. 101 (Jan. 10, 2022). Vazquez then pled guilty to the second-degree murder in violation of 18 U.S.C. § 1111, attempted murder in violation of 18 U.S.C. § 1113, and assault with a dangerous weapon in violation of 18 U.S.C. § 113(a)(3). Id., ECF No. 111 (Mar. 9, 2022).

## CONCLUSIONS OF LAW

### I.  Limitation of Liability Act

"Under federal admiralty law, a shipowner owes its crew a seaworthy vessel" and is "absolutely liable for injuries arising from the vessel's unseaworthiness." Carr v. PMS Fishing Corp., 191 F.3d 1, 3 (1st Cir. 1999) (citations omitted). The Limitation of Liability Act, 46 U.S.C. § 30505, "cabins this liability," providing, "in general terms, that an owner's liability cannot exceed the value of its interest in the vessel (and her freight, then pending) . . . valued as of the end of the voyage on which the loss or damage occurs." Id. at 4. But "[i]f the owner-friendly Limitation of Liability Act is viewed as an exception to the rule of absolute liability for unseaworthiness, there is an exception to the exception: this limitation applies only if the shipowner

[11]

lacked 'privity or knowledge' of the act or condition that caused the injury." Id.

Limitation of Liability proceedings involve two steps: "First, the court must determine whether negligence or unseaworthiness caused the accident. Second, the court must determine whether the shipowner was privy to, or had knowledge of, the causative agent (whether negligence or unseaworthiness)." Id. The proceedings also "engender a divided burden of proof," with the claimant bearing "the initial devoir of persuasion vis-à-vis negligence and unseaworthiness," which "then shifts to the shipowner to establish its lack of privity and knowledge." Id. "Both the claimant's and the shipowner's burdens contemplate proof by a fair preponderance of the evidence." Id.

## II.  Unseaworthiness

The Supreme Court held that "the owner's duty to furnish a seaworthy ship is absolute and completely independent of his duty under the Jones Act to exercise reasonable care." Mitchell v. Trawler Racer Inc., 362 U.S. 539, 549 (1960). "[T]he shipowner's actual or constructive knowledge of the unseaworthy condition is not essential to his liability." Id. "The duty is absolute, but it is a duty only to furnish a vessel and appurtenances reasonably fit for their intended use." Id. at 550. This has been elucidated to mean "the ship must be 'one that is staunch and strong, that is

fitted out with all proper equipment and in good order, and <u>that carries a sufficient and competent crew</u> and complement of officers.'" <u>Carr</u>, 191 F.3d at 3 (quoting <u>Gutierrez v. Waterman S.S. Corp.</u>, 373 U.S. 206, 216–17 (1963) (Harlan, J., dissenting)) (emphasis added). The duty of a shipowner to provide a seaworthy vessel is no "less onerous with respect to an unseaworthy condition arising after the vessel leaves her home port, or . . . with respect to an unseaworthy condition which may be only temporary." <u>Mitchell</u>, 362 U.S. at 549.

While a shipowner is not liable "every time a seaman gets drunk and does damage to a member of the crew," liability for unseaworthiness arises when a seaman has such "a savage and vicious nature" as to endanger the others who work on the ship. <u>Boudoin v. Lykes Bros. S. S. Co.</u>, 348 U.S. 336, 339 (1955). A shipowner is not liable for injuries "resulting from every sailor's brawl" because "[s]ailors lead a rough life and are more apt to use their fists than office employees; what will seem to sedentary and protected persons an insufficient provocation for a personal encounter, is not the measure of the 'disposition' of 'the ordinary men in the calling.'" <u>Id.</u> (quoting <u>Jones v. Lykes Bros. Steamship Co.</u>, 204 F.2d 815, 817 (2d Cir. 1953)). The decisive question is whether the assaulting seaman was "equal in disposition to the ordinary men of that calling" such that "the assault [was] within the usual and customary standards of the calling." <u>Boudoin</u>, 348

[13]

U.S. at 340. "[T]he assailant's savage disposition can be proven either by independent evidence of his quarrelsome nature or by the fact that a weapon was used by the assailant." Connolly v. Farrell Lines, Inc., 268 F.2d 653, 656 (1st Cir. 1959) (citing Jones, 204 F.2d at 816–17); see also 1B Benedict on Admiralty § 31 (2022) ("When weapons other than fists are used in a fight, the plaintiff may . . . prove the bad character of the assailant, and hence unseaworthiness, by the nature of the assault itself. In extreme cases involving violent assault . . . the court might be persuaded to rule as a matter of law that the viciousness of the attack rendered the vessel unseaworthy."). A knife is "an unmistakably deadly weapon." Connolly, 268 F.2d at 656 (collecting cases).

I find that Vazquez's unprovoked murder of Sosa by stabbing him a dozen times with a knife shows he had a vicious and savage disposition beyond the usual standards of the calling, rendering the Billy Haver unseaworthy. Because Sosa has met her burden on unseaworthiness, the Court does not address negligence.

### III. **Knowledge or Privity**

If the claimant meets its burden of proving unseaworthiness in the first stage, the burden shifts to the shipowner to prove that it lacked privity or knowledge of the condition of

unseaworthiness that caused the loss.[1] <u>Carr</u>, 191 F.3d at 5. Privity or knowledge can be actual or constructive, and "usually implies some degree of culpable participation or neglected duty on the shipowner's part: that, for example, it committed a negligent act, or knew of an unseaworthy condition but failed to remedy it, or through the exercise of reasonable diligence could have prevented the commission of the act or the onset of the condition." <u>Id.</u> at 4. "When a corporation owns the vessel, the test is whether culpable participation or neglect of duty can be attributed to an officer, managing agent, supervisor, or other high-level employee of the corporation." <u>Id.</u>

Claimant asserts two theories under which Petitioner had knowledge or privity. First, Claimant argues that Petitioner did not prove that co-owner Debra Haver lacked privity or knowledge of Vazquez's violent nature because she did not testify at the trial. Haver is the co-owner and secretary of Captain Juan, Inc. and the wife of Jose Araiza. It is undisputed that Debra Haver was not involved in hiring for the Billy Haver. Captain Araiza, who was in charge of hiring, did not know that Vazquez used drugs when he hired him for the September trip. Captain Araiza testified credibly

---

[1] The parties have not analyzed privity separately from knowledge, nor do they cite cases that define "privity." In this context, the appropriate dictionary definition is essentially "knowledge or awareness." <u>See</u> <u>Privity</u>, <u>Black's Law Dictionary</u> (11th ed. 2019) ("Joint knowledge or awareness of something private or secret, esp. as implying concurrence or consent <privity to a crime>.").

that, if he had known of his drug use, he would not have allowed Vazquez on board. Herrera testified that Vazquez had a reputation in the fishing community for using drugs, but the testimony was vague and conclusory as to how widespread this reputation was. Accordingly, Petitioner has presented sufficient evidence to prove that no officer or managing agent had knowledge of Vazquez's drug use or propensity for violence.

Claimant next argues that Captain Araiza, through the exercise of reasonable diligence, would have learned of Vazquez's drug use but he failed to take reasonable care in hiring Vazquez. For example, he did not administer drug tests or check with other shipowners in Newport News. While administering drug tests to crew members prior to embarking seems like good practice, Mr. Araiza has presented evidence that it was not industry practice to do so, and Claimant has presented no case law or other legal authority establishing such a duty or practice. It was not unreasonable for Captain Araiza to rely on his own prior experience with Vazquez as the basis for hiring him. Petitioner has met its burden of proof as to lack of knowledge and privity.

## IV.  **Limitation (Value of the Vessel)**

Under the Limitation of Liability Act, "the owner's [] interest in the vessel and pending freight," 46 U.S.C. § 30505(a),

[16]

has been interpreted to include more than just the hull of the ship:

> The real object of the act in question was to limit the liability of vessel owners to their interest in the adventure. Hence, in assessing the value of the ship, the custom has been to include all that belongs to the ship, and may be presumed to be the property of the owner,-not merely the hull, together with the boats, tackle, apparel, and furniture, but all the appurtenances, comprising whatever is on board for the object of the voyage, belonging to the owners, whether such object be warfare, the conveyance of passengers, goods, or the fisheries.

The Main v. Williams, 152 U.S. 122, 131 (1894). The Limitation Act "was designed to encourage investment and protect vessel owners from unlimited exposure to liability." Lewis v. Lewis & Clark Marine, Inc., 531 U.S. 438, 453 (2001).

The parties dispute whether the Permit is an appurtenance of the Billy Haver for the purposes of the Limitation of Liability Act. The caselaw on point is surprisingly sparce. Claimant relies heavily on Gowen, Inc. v. F/V Quality One, 244 F.3d 64 (1st Cir. 2001), which held that a permit is an "appurtenance" of a vessel subject to a maritime lien, which "attaches not only to the bare vessel but also to equipment that is used aboard the vessel and is 'essential to the vessel's navigation, operation, or mission.'" Id. at 67 (quoting Gonzalez v. M/V Destiny Panama, 102 F. Supp. 2d 1352, 1356 (S.D. Fla. 2000)). The Court reasoned that a maritime lien attaches to the intangible rights granted by a permit "that play a role similar to the vessel's equipment." Id. at 68. In

[17]

reaching this conclusion, the First Circuit considered "whether treating such permits as subject to maritime liens advances the objectives for which such liens were created and if so, whether there are any overriding objections to the contrary." Id. In answering this question, the Court noted that "not only the market value but the creditworthiness of the fishing vessel may well depend on its permits quite as much as on its engine, physical dimensions, and navigation equipment." Id.

Petitioner responds by arguing that Gowen should be limited to the context of a maritime lien. Its argument is anchored by Matter of Complaint of B&C Seafood, LLC, 426 F. Supp. 3d 82 (D.N.J. 2019). In holding that a permit is not an appurtenance, the magistrate judge emphasized the intangible nature of a permit to find it is not "on board" the vessel for the purpose of the Limitation of Liability Act. Id. at 86-87. The judge distinguished Gowen because maritime liens "were created to promote commerce by allowing suppliers to freely extend credit to ships but still be protected from shipowners escaping their debts by sailing away without payment," whereas the Limitation of Liability Act "is intended to limit a vessel owner's liability by preventing exposure to unlimited liability." Id. at 87. The Court finds this reasoning unpersuasive because including the permit in the valuation of a

vessel does not impose "unlimited liability" on a shipowner: it merely increases the amount to which liability is limited.

The record demonstrates that this type of permit qualifies as an "appurtenance." The permit is issued to a vessel based on the vessel's history and specifications, see 50 C.F.R. § 648.4(a)(2)(i)(E) (citing 50 C.F.R. § 648.4(a)(1)(i)(E)); must be carried on board the vessel, see 50 C.F.R. § 648.4(l); and is presumed to be transferred with the vessel, see 50 C.F.R. § 648.4(a)(2)(i)(D) (citing 50 C.F.R. § 648.4(a)(1)(i)(D)). As such, it must be included in cataloging "whatever is on board for the object of the voyage." The Main, 152 U.S. at 131. The vessel cannot fish, and thus cannot complete its object, without its permit physically on board. Even though the rights the permit bestows are intangible, the Gowen Court rejected intangibility as a bar to something being an appurtenance. 244 F.3d at 68. And intangible passage fares are considered freight for the purposes of the Act, even though they are not put at risk by the venture. See The Main, 152 U.S. at 129.

Most importantly, it is unjust to count permits as appurtenances for the purpose of shipowners securing credit, but then exclude permits to limit shipowner's liability to injured seamen and their estates. The Supreme Court ruled that the Limitation of Liabilities Act should be construed so as to "not

limit the right of the injured party to a recovery beyond what is necessary to effectuate the purposes of congress." The Main, 152 U.S. at 133. Including the Permit limits the shipowner's liability to its interest in the venture, effectuating Congressional intent without unduly limiting Claimant's recovery.

The evidence has shown that the value of the vessel and appurtenances other than the Permit is $1.1 million and the value of its pending freight at the conclusion of the voyage was $65,968.75. The Permit's value, $5 million, must be included in the value of the vessel and its pending freight: $6,165,968.75.

## ORDER

Sosa's death was caused by the unseaworthiness of the F/V Captain Billy Haver but without the privity or knowledge of Petitioner. Petitioner is entitled to limit its liability to $6,165,968.75.

SO ORDERED.

/s/ PATTI B. SARIS
Hon. Patti B. Saris
United States District Judge